IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE RESIDENCE AND CURTILAGE LOCATED AT:** | |
| 501 PENNSYLVANIA AVENUE, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 1") | Magistrate No. 20-1947 **[UNDER SEAL]** |
| 1234 ROEMER BLVD, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 2") | Magistrate No. 20-1948 **[UNDER SEAL]** |
| 1226 WASHINGTON STREET, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 3") | Magistrate No. 20-1949 **[UNDER SEAL]** |
| 1015 HUEY STREET, NEW CASTLE, PENNSYLVANIA 16101 ("TARGET LOCATION 4") | Magistrate No. 20-1950 **[UNDER SEAL]** |
| 1201 ROEMER BLVD, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 5") | Magistrate No. 20-1951 **[UNDER SEAL]** |
| 1002 WALNUT STREET, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 6") | Magistrate No. 20-1952 **[UNDER SEAL]** |
| 98 CAPITAL COURT, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 7") | Magistrate No. 20-1953 **[UNDER SEAL]** |
| 270 SHENANGO BOULEVARD, FARRELL, PENNSYLVANIA 16121 ("TARGET LOCATION 8") | Magistrate No. 20-1954 **[UNDER SEAL]** |
| 936 HAZEL STREET, NEW CASTLE, PENNSYLVANIA 16101 ("TARGET LOCATION 9") | Magistrate No. 20-1955 **[UNDER SEAL]** |

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, Scott F. Patterson, IV, Narcotics Agent of the Pennsylvania Office of Attorney General, being duly sworn, state as follows:

1

## I.   INTRODUCTION AND AGENT BACKGROUND

1.   This Affidavit is made in support of Application under Rule 41 of Federal Rules of Criminal Procedures for the issuance of search warrants for the following locations:

a.   **501 Pennsylvania Avenue, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 1")**.   **TARGET LOCATION 1** is further described in Attachment A1, which is appended to this affidavit and incorporated herein by reference.   This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 1** pursuant to the search protocols in Attachment BII;

b.   **1234 Roamer Boulevard, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 2")**.   **TARGET LOCATION 2** is further described in Attachment A2, which is appended to this affidavit and incorporated herein by reference.   This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 2** pursuant to the search protocols in Attachment BII;

c.   **1226 Washington Street, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 3")**.   **TARGET LOCATION 3** is further described in Attachment A3, which is appended to this affidavit and incorporated herein by reference.   This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 3** pursuant to the search protocols in Attachment BII;

d.   **1015 Huey Street, New Castle, Pennsylvania 16101** (hereinafter, **"TARGET LOCATION 4")**.   **TARGET LOCATION 4** is further described in Attachment A4, which is appended to this affidavit and incorporated herein by reference.   This application also

specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 4** pursuant to the search protocols in Attachment BII;

      e.    **1201 Roamer Boulevard, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 5"**).  **TARGET LOCATION 5** is further described in Attachment A5, which is appended to this affidavit and incorporated herein by reference.  This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 5** pursuant to the search protocols in Attachment BII;

      f.    **1002 Walnut Street, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 6"**).  **TARGET LOCATION 6** is further described in Attachment A6, which is appended to this affidavit and incorporated herein by reference.  This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 6** pursuant to the search protocols in Attachment BII;

      g.    **98 Capital Court, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 7"**).  **TARGET LOCATION 7** is further described in Attachment A7, which is appended to this affidavit and incorporated herein by reference.   This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 7** pursuant to the search protocols in Attachment BII;

      h.    **270 Shenango Boulevard, Farrell, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 8"**).  **TARGET LOCATION 8** is further described in Attachment A8, which is appended to this affidavit and incorporated herein by reference.  This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 8** pursuant to the search protocols in Attachment BII; and

i.   **936 Hazel Street, New Castle, Pennsylvania 16121** (hereinafter, **"TARGET LOCATION 9"**).   **TARGET LOCATION 9** is further described in Attachment A9, which is appended to this affidavit and incorporated herein by reference.   This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 9** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 1, TARGET LOCATION 2, TARGET LOCATION 3, TARGET LOCATION 4, TARGET LOCATION 5, TARGET LOCATION 6, TARGET LOCATION 7, TARGET LOCATION 8,** and **TARGET LOCATION 9** are hereinafter referred to collectively as the **TARGET LOCATIONS**.

2.    Search warrants for the aforementioned locations are being sought as part of an investigation of a Western Pennsylvania Drug Trafficking Organization ("the Organization"). Members of the Organization are engaged in violations of Title 21, United States Code, Sections 841(a)(1) (distributing and/or possessing with intent to distribute a controlled substance), 843(b) (using any communication facility in committing a drug trafficking crime), and 846 (attempting or conspiring to commit a drug trafficking crime) (collectively, the "SUBJECT OFFENSES").

3.    This investigation resulted in the Grand Jury, sitting in the Western District of Pennsylvania, returning a two-count federal Indictment on September 22, 2020 charging thirteen Defendants at Count One with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii) and in violation of Title 21, United States Code, Section 846, and two Defendants at Count Two with conspiracy to distribute and possess with intent to distribute 40 grams or more of fentanyl, a Schedule II controlled

substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(vi) and in violation of Title 21, United States Code, Section 846.   The thirteen Defendants charged at Count One of the Indictment are Bruce MCKNIGHT ("MCKNIGHT"), Norberto CASTILLO-LOPEZ ("LOPEZ"), Jossian AYALA-RUBERTE ("AYALA"), Luis MATTEI-ALBIZU ("MATTEI"), Nathaniel MCKNIGHT, Michael TALBERT ("TALBERT"), Tony MCKNIGHT, Trevor AUSTIN ("AUSTIN"), Thomas PIERCE, Jr. ("PIERCE"), Thomas JONES ("JONES"), Romondo OATIS ("OATIS"), Darnell LATHAM ("LATHAM"), and Brandon JETTER ("JETTER") (collectively, the "TARGET SUBJECTS").   MCKNIGHT and Nathaniel MCKNIGHT are also charged in Count Two.

4.      I submit there is probable cause to believe that the TARGET SUBJECTS have used and continue to use the **TARGET LOCATIONS** in furtherance of the SUBJECT OFFENSES.   I further submit that there is probable cause to believe there are within the **TARGET LOCATIONS**, as described in attachments A1 through A9, instrumentalities, contraband, and fruits of violations of the SUBJECT OFFENSES to including cellular telephones as well as electronic data, controlled substances, internet records, drug paraphernalia, financial records concerning the distribution of drugs, firearms/weapons, cash/currency, indicia of residency, and other evidence of drug trafficking, as more fully described in Attachment BI, which is appended to this affidavit and incorporated herein by reference.   Finally, I submit there is probable cause to believe that any cellular telephone recovered from the **TARGET LOCATIONS** will contain fruits of violations of the SUBJECT OFFENSES; therefore, this application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET**

**LOCATIONS** pursuant to the search protocols described in Attachment BII, which is appended to this affidavit and incorporated herein by reference.

5.     I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.   I am also a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

6.     I am a case-specific Task Force Officer with the Drug Enforcement Administration ("DEA"), Pittsburgh District Office, HIDTA Task Force Group.   I have been employed as a Narcotics Agent for the Commonwealth of Pennsylvania with the Pennsylvania Office of Attorney General since April of 2016.   Prior to employment with the Pennsylvania Office of Attorney General, I was employed as a Patrol Officer with the Southwest Mercer County Regional Police Department in Farrell, Mercer County, Pennsylvania from 2009 to 2016.   For six (6) of those years I was assigned to the Mercer County Drug Task Force, managed and subsidized by the Pennsylvania Office of Attorney General, Bureau of Narcotic Investigations and Drug Control. In addition, I was deputized and assigned to an Organized Crime Drug Enforcement Task Force with the Federal Bureau of Investigation for approximately three (3) of those years.   During that time, I assisted an investigative unit dealing with drug trafficking, gangs, and violent crimes in the Western District of Pennsylvania .

7.     I have attended numerous training conferences concerning narcotic investigations organized by the Pennsylvania Office of Attorney General, Bureau of Narcotic Investigations and Drug Control and utilized these additional investigative techniques and skills to author and assist

in the execution of a substantial number of narcotics search-and-seizure warrants during tenure as a law enforcement officer. I have personally conducted undercover purchases of controlled substances, supervised the controlled purchases of controlled substances using confidential informants, conducted consensual and non-consensual interceptions of communications and conducted extensive surveillance of drug traffickers.  I have successfully arrested and obtained convictions at both the State and Federal levels, concerning violations of the Pennsylvania Controlled Substance, Drug, Device and Cosmetics Act and related offenses.

8.      I have received extensive training relating to the enforcement of the Controlled Substance, Drug, Device and Cosmetics Act of April 14, 1972, P.L. 233, No. 64, Section 1, et seq., and related offenses under the Pennsylvania Crimes Code from the Municipal Police Officer's Training Academy, the Pennsylvania Office of Attorney General , the Pennsylvania Narcotics Officers Association, the DEA, the Federal Bureau of Investigations, the Department of Justice, the Middle Atlantic-Great Lakes Organized Crime Law Enforcement Network, and the Northeast Counterdrug Training Center.

9.      I have participated in numerous investigations involving violations of the Controlled Substance, Drug, Device and Cosmetics Act.   As a result, I have interacted with users and traffickers of controlled substances; supervised controlled purchases of controlled substances; conducted surveillance of drug traffickers; served as the affiant on search warrants and criminal complaints; supervised consensual interceptions of wire, electronic and oral communications, and participated in monitoring and/or surveillance on more than twenty (20) non-consensual interceptions at both the State and Federal levels.   I have conducted and participated in a substantial number of investigations involving cocaine, fentanyl, and other controlled substances.

7

Through these investigations and search warrants, I have gained expertise relative to the methods used by persons trafficking in, possessing, and using controlled substances, as well as the identification of narcotics and controlled substances.

10.     I have experience analyzing telephone records and conducting surveillance as well as interviewing suspects, numerous informants, cooperating defendants, and other individuals involved in the illegal drug culture, among other investigative techniques.   I have learned about methods of operation and terminology utilized by individuals who distribute illegal drugs, and have monitored numerous consensual and non-consensual interceptions of communications involving illegal drug activity.   As a result, I am familiar with the terms and vocabulary, or "slang," used by individuals associated with illegal drug activity.

11.     I know that it is common practice for drug traffickers to routinely utilize telephones, mobile phones, prepaid phones, public phones, text messaging, counter surveillance, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from detection by law enforcement. These individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing and distributing controlled substances, in addition to arranging concealment of proceeds derived from the sale of controlled substances.

12.     I am aware that in a substantial number of residential and vehicle searches executed in connection with drug investigations, in which myself and fellow law enforcement officers in the Western District of Pennsylvania have been involved, the following kinds of drug-related evidence have typically been recovered: (a)  controlled substances, such as but not limited to cocaine and fentanyl; (b) paraphernalia for packaging, processing, diluting, weighing, and

distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as inositol, mannitol, mannite, and vitamin B12; (c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances; (e) cash, currency, and records relating to controlled substance income and expenditures of money and wealth, for example: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds - this evidence often is located in a safe; (f) documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports, visas, credit card receipts and telephone bills; (g) computers, cellular telephones, and/or other electronic media utilized for communication and data saving purposes, as well as documents relating thereto; (h) firearms and other dangerous weapons; and (i) identification evidence and/or indicia (such as cancelled mail, deeds, leases, rental agreements, photographs, bills, and identification documents) which tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.

13.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, and drug records (as described above) at or in their residences (including garages and outbuildings), businesses, and vehicles, or at or in the residences, businesses, and vehicles of

relatives or other trusted associates.   Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended.   Often, drug traffickers keep "pay and owe" records to document balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' suppliers and the traffickers' distributors.   Additionally, drug traffickers must maintain telephone listings of clients and suppliers to efficiently conduct their drug trafficking business.   Such listings are frequently kept inside their cell phones or within their residences.

14.   Drug traffickers commonly use vehicles to move quantities of drugs and currency to other locations for storage and further distribution and use, and that drug traffickers often rent vehicles instead of using their own to prevent their own vehicles from being seized by law enforcement officials.   They often swap vehicles with other conspirators, use vehicles with dealer/interchangeable registration plates, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own to frustrate law enforcement efforts.

15.   Drug traffickers commonly possess and use multiple cell phones simultaneously to conduct their drug trafficking activities and must keep these phones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.   This is so because drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds

derived from the sale of controlled substances. It is common for these cell phones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cell phones immediately after they stop actively using them.   Therefore, while it is common for drug traffickers to stop using specific cell phones, it is far less common for drug traffickers to actually discard their cell phones after they switch to new cell phones.   As a result, I am aware that collections of cell phones have been found during the execution of drug trafficking search warrants, including cell phones that were no longer being used by a particular drug trafficker, but had nevertheless been retained.

16.     It is also a generally common practice for traffickers to conceal inside their residences or businesses or vehicles (particularly if they have a trap/hidden compartment), or inside the residences or businesses or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be used to purchase controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.   Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in the residences, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

17.     Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers.   Drug traffickers do not typically make police reports when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts.   As a result, it is common for drug traffickers to arm themselves instead

of calling the police or seeking legal recourse.   And, because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations, such as their residences, businesses, and vehicles.

18.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.   Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

19.     I am aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices.   I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences.   When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

20.     Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers.   In so doing, they acquire property, services, and personal

identification items (such as driver's licenses and birth certificates) under their assumed or alias names.   They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

21.   Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities.   In addition, large-scale drug traffickers often have multiple locations (including businesses, residences, and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities.   Finally, it has become much more common for drug traffickers to utilize computers, cell phones, and/or other electronic media for communication and data-acquisition and data-retention purposes.   It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

22.   Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs.   Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, instant messages, or apps.   It should be noted that, with the advance of technology, the distinction between computers and cell phones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.   In addition, those involved in drug trafficking crimes commonly communicate using multiple cell phones.   Contemporaneous possession of multiple cell phones is, therefore, evidence of drug trafficking.   Moreover, the particular numbers of and the particular numbers dialed by particular cell phones can be evidence of drug trafficking,

particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

23.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.   Digital information can also be retained unintentionally.

24.    Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

25.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.   Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.   When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record

of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

26.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this affidavit, arises from, among other things, the following:   a) my own involvement in this and prior drug investigations and searches during my career, as previously described; b) my involvement on a number of occasions in debriefing confidential informants and cooperating sources in prior drug investigations, as well as through information provided agents and police officers concerning the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) the review of thousands of intercepted telephone communications between drug traffickers during which the traffickers have discussed the topics referenced herein.

27.     In addition, as a result of conversations with Assistant United States Attorneys, I am aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found in places with a nexus to their crimes, including both the locations where the dealers reside and other locations to which they and their co-conspirators have access, even if no drug trafficking was directly observed to occur there. Even

15

without direct observation of drug trafficking in these locations, a nexus may be inferred and established based upon "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide . . .  [evidence]." United States v. Stearn, 597 F.3d 540, 558 (3d Cir. 2010) (citation and quotation marks omitted). This inference "is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities," which are all satisfied with respect to the TARGET SUBJECTS and the **TARGET LOCATIONS** as set forth in further detail below.   United States v. Burton, 288 F.3d 91, 104 (3d Cir. 2002).

28.     The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other individuals, including other law enforcement personnel, review of records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.   Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, this affidavit does not set forth each and every fact learned by me during this investigation.   I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## II.    PROBABLE CAUSE

29.    In March of 2019, members of the Drug Enforcement Administration, Pennsylvania State Police, Pennsylvania Office of Attorney General, and the Lawrence County Drug Task Force began investigating the Organization for distributing large quantities of cocaine and fentanyl throughout the Western District of Pennsylvania.   The Organization operates in Lawrence County and Mercer County, Pennsylvania as well as in Columbus, Ohio; Harrisburg, Pennsylvania; Orlando, Florida; and Puerto Rico.   Since the initiation of this investigation, investigators have utilized cellular telephone analysis, physical and electronic surveillance, controlled drug purchases, vehicle stops, and court-authorized interceptions of wire and/or electronic communications over cellular telephones utilized by members of the Organization.   Specifically, over the course of this investigation, court-authorized interception of wire and/or electronic communications have occurred over, among other telephones, telephone number 724-931-1876, utilized by OATIS; telephone number 724-979-2909, utilized by JONES; telephone numbers 614-352-4164 and 614-687-5147, utilized by MCKNIGHT; and telephone number 724-734-9541 utilized by TALBERT

### a.    TARGET LOCATION 1

30.    **TARGET LOCATION 1** is OATIS' residence.   Throughout the investigation, investigators have conducted six controlled drug purchases of cocaine from OATIS.   Of these six controlled drug purchases, five occurred at **TARGET LOCATION 1**.   Further, OATIS has conducted additional cocaine transactions from **TARGET LOCATION 1**, as described below.

31.     On a known date in March of 2019 at approximately 1:14 p.m. and at the direction of your Affiant, a confidential source of information (hereinafter, "CS2")[1] placed an outgoing text message from CS2's known cellular telephone to OATIS over telephone number 724-931-1876. This text message read, "I need to c ya."   Based upon my training, knowledge, experience, and direct involvement in this investigation, I know that CS2 cryptically informed OATIS that CS2 desired to meet with OATIS for the purpose of purchasing a quantity of cocaine.    At approximately 1:22 p.m., OATIS responded by sending a text message from telephone number 724-931-1876 to CS2's telephone.   This text message read "K. Work til 330."   Based upon my training, knowledge, experience, and direct involvement in this investigation, I believe OATIS responded to CS2 and cryptically advised CS2 that OATIS could meet with CS2 later that day for the purpose of selling CS2 a quantity of cocaine.

32.     Later on the same day in March of 2019, CS2 received two follow-up text messages from telephone number 724-931-1876, utilized by OATIS.   The first text message occurred at approximately 4:17 p.m., and the second text message occurred at approximately 4:34 p.m.   Both

---

[1]     In 2017, Pennsylvania Office of Attorney General Agents approached CS2 regarding potential Pennsylvania state drug and firearms-related charges.   CS2 agreed to cooperate for prosecutorial consideration and financial compensation.   CS2 is not an anonymous source. CS2's interactions with law enforcement have been in person, and CS2 is aware that law enforcement knows the true identity of CS2.   Additionally, CS2 is periodically provided with admonishments and instructions that clearly outline CS2's involvement and guidelines.   To date, no information received from CS2 is believed to be dishonest or unreliable.   Additionally, information received through CS2 has been corroborated through controlled purchases of narcotics, telephone analysis, and physical and electronic surveillance.   For these reasons, and as demonstrated herein, your Affiant believes information received from CS2 to be reliable and true and accurate to the best of my knowledge.   Additionally, CS2 does have several drug-related convictions.   However, at this time, the details of CS2's convictions will not be included since doing so will likely reveal to OATIS, JONES, and their associates the identity of CS2 and thus place CS2's safety in jeopardy.

text messages read "Yo."   Based upon my training, knowledge, and experience as well as the previous text messages CS2 and OATIS exchanged, I believe that OATIS informed CS2 ("Yo") that OATIS was off from work ("…Work til 330") and was ready ("K…") to sell CS2s a quantity of cocaine ("I need to c ya").   At approximately 4:36 p.m., at the direction of your Affiant, CS2 called OATIS over telephone number 724-931-1876.   During the call, OATIS advised CS2 to "come to the crib."   CS2 informed your Affiant that CS2 knew this to mean that OATIS wanted CS2 to travel to OATIS' residence, **TARGET LOCATION 1**, for the purpose of selling CS2 a quantity of cocaine.   Subsequently, on the same day of March of 2019 and as a result of the aforementioned text messages and call between CS2 and OATIS over telephone number 724-931-1876, investigators conducting physical surveillance observed CS2 meet with OATIS and purchase a quantity of cocaine from OATIS with a quantity of Pennsylvania Office of Attorney General Official Advanced Funds at **TARGET LOCATION 1**.

33.   On December 23, 2019 between approximately 11:35 a.m. and approximately 1:43 p.m., OATIS exchanged a series of text messages over telephone number 724-931-1876 with telephone number 724-988-9369, utilized by Matthew WASSER ("WASSER").[2]   Below is a transcription of the text messages exchanged between OATIS ("RO") and WASSER ("MW"):

MW:   "Able to meet when I get off?"

RO:   "K. Hic grill. What to bring"

MW:   "Ball. And a 60.."

---

[2]   An indictment was not sought against WASSER as a result of this investigation. Investigators identified WASSER as the user of telephone number 724-988-9369 because telephone number 724-988-9369 is registered to him.   Further, WASSER ultimately met with OATIS at the precise time and in the precise location that OATIS agreed to meet with the male who utilized the telephone 724-988-9369 for the purpose of OATIS selling the user of telephone number 724-988-9369 cocaine.

RO:   "K"

MW:   "Almost there"

RO:   "Yo just come to my crib. I thought u were off at 330. I was plan to be there at 350pm"

MW:   "Ok"

34.     Based upon my training, knowledge, experience, and the context of these text messages, I believe that WASSER contacted OATIS over telephone number 724-931-1876 for the purpose of purchasing 3.5 grams of cocaine ("8 ball") as well as $60 of Oxycodone.   WASSER agreed to meet with OATIS at the Hickory Grill, located in Hermitage, Pennsylvania ("K. Hic grill").   WASSER advised OATIS that he was close to the Hickory Grill, but OATIS responded that he was not ready to meet with WASSER.   OATIS then instructed WASSER to meet OATIS at **TARGET LOCATION 1** ("Yo just come to my crib").   WASSER affirmed.

35.     On December 23, 2019 at approximately 2:00 p.m., OATIS received an incoming telephone call over telephone number 724-931-1876 from telephone number 724-988-9369, utilized by WASSER.   Below is a transcription of the conversation between OATIS ("RO") and WASSER ("MW"):

RO:   "Yo."

MW:   "Yo, I'm here."

RO:   "Alright I'm pulling up. I was just about to call you, see where you was at."

MW:   "Oh alright."

36.     Based upon my training, knowledge, experience, the previous text messages OATIS and WASSER exchanged, and the context of this conversation, I believe that WASSER

called OATIS to advise OATIS that WASSER had arrived at OATIS' residence to purchase the 3.5 grams of cocaine and $60 of Oxycodone from OATIS.

37.     On December 23, 2020 at approximately 2:04 p.m., investigators monitored the pole camera positioned outside of **TARGET LOCATION 1**.  Investigators observed WASSER, who was identified through his Pennsylvania Justice Network Photograph, exit a red Ford Fusion, bearing Pennsylvania registration JPV-5453 and meet with OATIS in front of **TARGET LOCATION 1**.   WASSER and OATIS then entered **TARGET LOCATION 1**.   WASSER exited OATIS' residence a short time after, reentered the red Ford Fusion, and drove away. Based upon my training, knowledge, and experience; the intercepted communications between OATIS and WASSER; and the pole camera surveillance of OATIS and WASSER, I believe that OATIS met with WASSER inside of **TARGET LOCATION 1** for the purpose of selling WASSER 3.5 grams of cocaine and $60 of Oxycodone.

38.     On January 22, 2020 at approximately 3:57 p.m., OATIS received an incoming call over telephone number 724-931-1876 from telephone number 724-734-3209, utilized by Kevin CROMARTIE ("CROMARTIE").[3]   Below is a transcription of the conversation between OATIS ("RO") and CROMARTIE ("KC"):

        KC:     "Hey what's up old man?"

        RO:     "What's up [Unintelligible]?"

        KC:     "Oh same old same.   You on your way home from work?"

---

[3]     An indictment was not sought against CROMARTIE as a result of this investigation. Investigators believe that CROMARTIE utilizes telephone number 724-734-3209 because CROMARTIE ultimately met with OATIS at the precise time and in the precise location that OATIS agreed to meet with the male who utilized telephone number 724-734-3209 for the purpose of OATIS selling the user of telephone number 724-734-3209 cocaine.

RO:     "Yeah.   Driving home now."

KC:     "[Chuckles] Hey man I need a favor.   Um.   One of them, one of them, one, one, one soft and um two hard."

RO:     "Uh…Uh what, what I owe you and that?"

KC:     "Yeah, yeah, yeah, yeah, yeah.   So I'll just, we'd be back at, I mean I owe you 250 I do believe."

RO:     "Okay.   Oh you want….Oh, I see what you're saying.   Alright.   I'll call you as soon as uh, uh, you know.

KC:     "Yeah, yeah.   Least if you, I mean, I just want to just call you know at least I can have it for, for Friday. You know what I mean?"

RO:     "Okay."

KC:     "Yeah just hit me up.   One, one soft and two hard.   Alright."

RO:     "Alright.   Alright."

KC:     "Yeah."

39.     Based upon my training, knowledge, and experience and the context of this conversation, I believe that CROMARTIE called OATIS and requested to purchase one ounce of cocaine and two ounces of crack cocaine ("one soft and um two hard").   OATIS informed CROMARTIE that OATIS would sell CROMARTIE the one ounce of cocaine and two ounces of crack cocaine as soon as he was resupplied with the cocaine ("I'll call you as soon as uh, uh, you know").

40.     Immediately after speaking with CROMARTIE, on January 22, 2020 between approximately 3:59 p.m. and approximately 4:02 p.m., OATIS exchanged a series of text messages over telephone number 724-931-1876 with telephone number 724-734-9541, utilized by

TALBERT.   Below is a transcription of the text messages OATIS ("RO") and TALBERT ("MT")

exchanged:

> RO:   "Yo yo"
>
> MT:   "Wat up"
>
> RO:   "May need bout 6 or so. Waiting for my dude at work"
>
> MT:   "Word just hit me"

41.     Based upon my training, knowledge, and experience; the conversation between

OATIS and CROMARTIE; and the context of these text messages, I believe that OATIS contacted

TALBERT for the purpose of purchasing approximately six ounces of cocaine from TALBERT

("May need bout 6 or so…") so that OATIS, in turn, could sell one ounce of cocaine and two

ounces of crack cocaine to CROMARTIE ("…Waiting for my dude at work").   TALBERT

advised OATIS to contact TALBERT when OATIS was ready to purchase the six ounces of

cocaine ("Word just hit me").

42.     On January 22, 2020 at approximately 4:25 p.m., OATIS placed an outgoing call

from telephone number 724-931-1876 to telephone number 724-734-3209, utilized by

CROMARTIE.   Below is a transcription of the conversation between OATIS ("RO") and

CROMARTIE ("KC"):

> KC:   "What's up good people?"
>
> RO:   "Hey you at home?"
>
> KC:   "Yeah"
>
> RO:   "Alright. R- G- Come to your door real quick."
>
> KC:   "Alright fam."

43.     Based upon my training, knowledge, and experience; the previous voice call between OATIS and CROMARTIE; the previous text messages between OATIS and TALBERT; and the context of this conversation, I believe that OATIS contacted CROMARTIE to collect money for the one ounce of cocaine and two ounces of crack cocaine that OATIS previously agreed to sell to CROMARTIE.   CROMARTIE then agreed; therefore, I believe that CROMARTIE met with OATIS and provided OATIS money for the cocaine.

44.     On January 22, 2020 between approximately 6:19 p.m. and approximately 6:25 p.m., OATIS exchanged a series of text messages over telephone number 724-931-1876 with 724-734-9541, utilized by TALBERT.   Below is a transcription of the text messages OATIS ("RO") and TALBERT ("MT") exchanged:

RO:     "2 Bizzy of Hizzy and 1 biz of siz"

MT:     "Okay give me 10 min"

45.     Based upon my training, knowledge, and experience; the previous communications between OATIS and CROMARTIE; the previous text messages between OATIS and TALBERT; and the context of these text messages, I believe that OATIS texted TALBERT to inform TALBERT that OATIS was ready to purchase cocaine from TALBERT.   TALBERT responded that TALBERT would sell the cocaine to OATIS in ten minutes

46.     Approximately twenty (20) minutes later on January 22, 2020, OATIS received an incoming call over telephone number 724-931-1876 from telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between OATIS ("RO") and TALBERT ("MT"):

RO:     "Yo"

24

MT:   "You, you wanted that?"

RO:   "Yep, yep. I'm waiting on you"

MT:    "Oh okay. I'll be up in a minute"

RO:   "Alright."

MT:   "Alright."

47.     On January 22, 2020 at approximately 6:55 p.m., OATIS received an incoming text message over telephone number 724-931-1876 from telephone number 724-734-9541, utilized by TALBERT.   The text message read "Here."   Simultaneously, investigators conducting physical surveillance in the area of **TARGET LOCATION 6** and **TARGET LOCATION 1**, observed TALBERT leave **TARGET LOCATION 6**.   TALBERT drove a maroon Chevrolet Silverado, bearing Pennsylvania registration ZMX-8215 (the "Chevrolet Silverado").   Investigators observed TALBERT drive directly to **TARGET LOCATION 1**.   Investigators then observed OATIS exit the front door of **TARGET LOCATION 1** and meet with TALBERT at the driver's side of the Chevrolet Silverado.   Less than 30 seconds later, OATIS walked away from TALBERT's vehicle and walked directly back into **TARGET LOCATION 1**.   TALBERT then drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and TALBERT; and the physical surveillance of OATIS and TALBERT, I believe that TALBERT supplied OATIS with a quantity of cocaine.

48.     On January 22, 2020 at approximately 7:14 p.m., OATIS placed an outgoing call from telephone number 724-931-1876 to telephone number 724-734-3209, utilized by CROMARTIE.   Below is a transcription of the conversation between OATIS ("RO") and CROMARTIE ("KC"):

KC:   "Yo what's going on bro?   I'm up at the Lighthouse."

RO:   "On your way home stop by."

KC:   "Alright good people.   I'll be there in like um, like a quarter, quarter to 8:00."

RO:   "Okay no problem."

KC:   "Alright later."

49.     On January 22, 2020 at approximately 8:10 p.m., investigators monitored the pole camera positioned outside of **TARGET LOCATION 1**.  Investigators observed CROMARTIE, who was identified through his Pennsylvania Justice Network Photograph, park in OATIS' driveway and exit a silver Honda Civic, bearing Pennsylvania registration JJX-7917. CROMARTIE entered **TARGET LOCATION 1**.   Approximately two minutes later, CROMARTIE exited **TARGET LOCATION 1**, reentered the silver Honda Civic, and drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and CROMARTIE; the pole camera surveillance of OATIS and CROMARTIE; and the short period of time that CROMARTIE spent inside of **TARGET LOCATION 1**, I believe OATIS supplied CROMARTIE with a quantity of cocaine that OATIS acquired from TALBERT inside of **TARGET LOCATION 1**.

50.     On February 26, 2020, between approximately 3:45 p.m. and approximately 4:39 p.m., OATIS exchanged a series of text messages over telephone number 724-931-1876 with TALBERT on telephone number 724-734-9541.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

RO:   "150 siz bout 430"

MT:   "Word"

26

RO:   "Ready"

MT:   "Be up in a min"

RO:   "K"

MT:   "Here"

51.     Based upon my training, knowledge, and experience and the context of these text messages, I believe that OATIS advised TALBERT that OATIS desired to purchase one-and-a-half ounces of cocaine from TALBERT.   TALBERT acknowledged OATIS' request and agreed to sell OATIS the cocaine.   Investigators monitored the pole camera surveillance outside of **TARGET LOCATION 1**.   On February 26, 2020 at approximately 4:44 p.m., investigators observed TALBERT arrive at **TARGET LOCATION 1** driving his Chevrolet Silverado. OATIS exited the front door of **TARGET LOCATION 1** and met with TALBERT at the passenger's side of TALBERT's Chevrolet Silverado.   OATIS reached his hand inside of the passenger's side window of TALBERT's Chevrolet Silverado.   Less than one minute later, OATIS walked away from TALBERT's Chevrolet Silverado and reentered **TARGET LOCATION 1**.   TALBERT then drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and TALBERT; and the short duration of OATIS' meeting with TALBERT outside of **TARGET LOCATION 1**, I believe that TALBERT ultimately sold OATIS the one-and-a-half ounces of cocaine and that OATIS took that cocaine into **TARGET LOCATION 1**.

52.     On May 2, 2020 between approximately 11:27 a.m. and approximately 12:58 p.m., OATIS exchanged a series of text messages over telephone number 724-931-1876 with TALBERT

on telephone number 724-734-9541.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

> RO:   "Ima hit u bout 1 pm"
>
> MT:   "Word"
>
> RO:   "Bring a buck of that bout 1 pm"
>
> MT:   "Ok"
>
> RO:   "Ready"

53.    Based upon my training, knowledge, and experience; my direct involvement in this investigation; and the context of these text messages, I believe that OATIS texted TALBERT to advise TALBERT that OATIS desired to purchase $100.00 of cocaine at approximately 1:00 p.m. TALBERT affirmed.

54.    On May 2, 2020 at approximately 1:12 p.m., OATIS placed an outgoing call from telephone number 724-931-1876 to TALBERT on telephone number 724-734-9541.   Below is a transcription of the conversation between TALBERT ("MT") and OATIS ("RO"):

> MT:   "Yo?"
>
> RO:   "Yo, how long you be?"
>
> MT:   "You at the crib?"
>
> RO:   "Yeah."
>
> MT:   "On my way."
>
> RO:   "Aight."
>
> MT:   "Aight."

55.     Based upon my training, knowledge, and experience; the previous text messages that TALBERT and OATIS exchanged; and the context of this conversation, I believe that OATIS asked TALBERT when TALBERT would arrive at OATIS' residence to sell OATIS $100.00 of cocaine.   TALBERT asked OATIS if OATIS was presently located at OATIS' residence, **TARGET LOCATION 1**.   OATIS replied that OATIS was presently located at OATIS' residence, **TARGET LOCATION 1**.   TALBERT advised OATIS that TALBERT was travelling to OATIS' residence, **TARGET LOCATION 1**, to sell OATIS the $100.00 of cocaine.   OATIS affirmed.

56.     Investigators monitored the pole camera positioned outside of **TARGET LOCATION 1**.   On May 2, 2020 at approximately 1:21 p.m., investigators observed TALBERT arrive at **TARGET LOCATION 1** driving his Chevrolet Silverado.   OATIS exited the front door of **TARGET LOCATION 1**, met with TALBERT at the passenger's side of TALBERT's Chevrolet Silverado, and reached in the window.   Approximately 1 minute later, OATIS walked away from TALBERT's Chevrolet Silverado and reentered **TARGET LOCATION 1**. TALBERT then drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and TALBERT; and the short duration of OATIS' meeting with TALBERT, I believe that TALBERT ultimately sold OATIS $100.00 of cocaine and that OATIS took the cocaine into **TARGET LOCATION 1**.

57.     On May 20, 2020 at approximately 6:02 p.m., OATIS placed an outgoing voice call from telephone number 724-931-1876 to TALBERT on telephone number 724-714-734-9541. Below is a transcription of the conversation between TALBERT ("MT") and OATIS ("RO"):

MT:     "Yo."

RO:     "What up buddy."

MT:     "What's going on?"

RO:     "Aint nothing, I was going to stop you when you came up, they, they was up there looking for somebody, some little young kid, up there."

MT:     "Right."

RO:     "But yeah...I was…, (muffled) nothing though?"

MT:     "Hell no!"

RO:     Alright, I'ma rap at you ah Friday and then we'll talk, cause you know (unintelligible) might be able to put something together."

MT:     "Ok."

RO:     "Alright."

MT:     "Alright."

58.     Based upon my training, knowledge, and experience as well as the context of this conversation, I believe that OATIS contacted TALBERT to purchase cocaine.   TALBERT informed OATIS that TALBERT has no cocaine for sale but was awaiting a resupply of cocaine. OATIS affirmed.   OATIS advised TALBERT that OATIS would contact TALBERT on Friday and that OATIS' associate could possibly supply TALBERT with cocaine ("might be able to put something together").   TALBERT affirmed.

59.     A search of **TARGET LOCATION 1** through CLEAR[4] revealed that OATIS currently resides at **TARGET LOCATION 1**.   Furthermore, a query through the Pennsylvania

---

[4]     Thomson Reuter's CLEAR ("CLEAR") is an online investigative database that supports public record searches and provides subscriber information for cellular telephone numbers. Based upon my training, knowledge, and experience, CLEAR has proven to be a reliable investigative database in previous investigations.

Department of Transportation revealed that **TARGET LOCATION 1** is OATIS' listed address on his Pennsylvania Driver's License.   GPS/E911 location data for telephone number 724-931-1876, utilized by OATIS, from October of 2019 through the middle of February of 2020 established that the telephone was consistently located at **TARGET LOCATION 1** with an accuracy of between 88 and 1,320 meters to include daytime and nighttime hours.   Additionally, physical surveillance and Pole Camera surveillance at **TARGET LOCATION 1** has shown OATIS repeatedly entering and exiting **TARGET LOCATION 1**.   As recently as September 13, 2020, investigators have observed OATIS enter and exit **TARGET LOCATION 1** during both daytime and nighttime hours.   Toll records for telephone number 724-931-1876, utilized by OATIS, revealed that OATIS has been in contact with PIERCE as recently as September 8, 2020

60.      Thus, based upon my training, knowledge, and experience; OATIS' intercepted communications; physical surveillance of OATIS; the GPS/E911 location data for telephone number 724-931-1876, utilized by OATIS; and the recent toll records for telephone number 724-931-1876, utilized by OATIS, I believe that (1) OATIS is a drug trafficker; (2) OATIS possesses and is domiciled at **TARGET LOCATION 1**; (3) OATIS and other members of the Organization continue to utilize **TARGET LOCATION 1** in furtherance of the SUBJECT OFFENSES; and (4) **TARGET LOCATION 1** contains evidence of the SUBJECT OFFENSES.

### b.      TARGET LOCATION 2 and TARGET LOCATION 3

61.      **TARGET LOCATION 2** is JONES' residence, and **TARGET LOCATION 3** is PIERCE's residence.   JONES accessed **TARGET LOCATION 2** during cocaine transactions, and PIERCE has accessed **TARGET LOCATION 3** during cocaine transactions, as discussed below.

31

62.     On a known date in December of 2019, a second confidential source of information (hereinafter, "CS4")[5] met with law enforcement at a prearranged staging location for the purpose of conducting a controlled purchase of cocaine from JONES.   At approximately 6:21 p.m., in the presence and at the direction of investigators, CS4 placed a recorded telephone call to JONES over telephone number 724-979-2909 from CS4's known cellular telephone.   Investigators monitored the call and corroborated the call through the pen register data for telephone number 724-979-2909.   JONES answered the telephone by stating, "Hello."   CS4 began to reply to JONES; however, JONES ended the call.   CS4 informed investigators that JONES answered the call. CS4 advised that JONES did not like to schedule drug transactions over the telephone.   However, CS4 further advised that, because JONES answered the telephone call, JONES was signaling to CS4 that JONES could sell CS4 a quantity of cocaine and that CS4 should travel to a prearranged meeting location to purchase the cocaine.

63.     Investigators provided CS4 with a quantity of Official Agency Funds and equipped CS4 with an audio and video recording device.   Investigators followed CS4 to the prearranged meeting location.   Investigators observed CS4 enter the prearranged meeting location.   CS4

---

[5]     In 2019, CS4 agreed to cooperate for financial compensation.   CS4 is not an anonymous source.   CS4's interactions with law enforcement have been in person, and CS4 is aware that law enforcement knows the true identity of CS4.   Additionally, CS4 is periodically provided with admonishments and instructions that clearly outline CS4's involvement and guidelines.   To date, no information received from CS4 is believed to be dishonest or unreliable.   Additionally, investigators have corroborated the information CS4 has provided through electronic surveillance. For these reasons, and as demonstrated herein, your Affiant believes information received from CS4 to be reliable and true and accurate to the best of my knowledge.   CS4 does have multiple drug-related felony and misdemeanor convictions as well as a felony firearms conviction and a felony attempted robbery conviction.   However, at this time, further details of CS4's convictions will not be included since doing so will likely reveal to JONES, PIERCE and their associates the identity of CS4 and thus place CS4's safety in jeopardy.

remained inside of the prearranged meeting location for a prolonged period of time.   Investigators then observed CS4 exit the prearranged meeting location.   Investigators followed CS4 to a predetermined staging location where CS4 provided a quantity of cocaine and Official Agency Funds to investigators.   CS4 advised that CS4 met with JONES.   CS4 agreed to purchase a specific quantity of cocaine from JONES in exchange for a specific quantity of Official Agency Funds.   CS4 then handed JONES the specific quantity of Official Agency Funds.   A short time later, PIERCE arrived and handed CS4 a white plastic bag containing the specific quantity of cocaine that CS4 agreed to purchase from JONES.   While physical surveillance was conducted, investigators did not observe PIERCE arrive at the prearranged meeting location.   However, there was heavy foot traffic in the area of the prearranged meeting location, and the controlled purchase occurred at night.   JONES then returned to CS4 a quantity of United States Currency to compensate CS4 for the wait.

64.   Investigators reviewed the audio and visual recording from the recording device. The recording does show CS4 meet with JONES.   However, the recording does not capture CS4 handing JONES the Official Agency Funds or PIERCE handing CS4 the cocaine.   Because CS4 was in the prearranged meeting location for a prolonged period of time, the battery on the audio and visual recording device died prior to the completion of the transaction.   Nevertheless, based upon my training, knowledge, and experience; the recorded telephone call between CS4 and JONES; and CS4's subsequent controlled purchase of cocaine from PIERCE and JONES, I believe that JONES answered CS4's phone call to inform CS4 that JONES could sell CS4 cocaine.   I further believe that, after CS4 provided JONES with the Official Agency Funds, JONES informed PIERCE of the quantity of cocaine that PIERCE should deliver to PIERCE.   PIERCE then

delivered that specific quantity of cocaine to CS4.   Finally, I believe that JONES' and PIERCE's behavior is consistent with JONES handling the financial portion of the drug transactions and instructing PIERCE to provide the specific quantities of cocaine to the purchaser(s).

65.   Subsequent interceptions of telephone number 724-724-931-1876, utilized by OATIS; telephone number 724-979-2909, utilized by JONES; and telephone number 330-632-4667, utilized by PIERCE reinforce this belief.   On December 22, 2019, at approximately 1:19 p.m., OATIS placed an outgoing call from telephone number 724-724-931-1876 to PIERCE on telephone number 330-632-4667.   Below is a transcription of the conversation between OATIS ("RO") and PIERCE ("TP"):

> TP:   "Hello."
>
> RO:   "Hey Peenie, what's the uh, name of the place you went to again?"
>
> TP:   "Say it one more time."
>
> RO:   "What's the name of the place you went to again?"
>
> TP:   "What place bro?"
>
> RO:   "The, the, vacation. The last one."
>
> TP:   "What you mean?"
>
> RO:   "What's the name of the place all yall went to? Yeah, the trip."
>
> TP:   "The people that booked it for us or the where we actually went?"
>
> RO:   "Yeah, where you actually went."
>
> TP:   "Oh we went to Runaway Bay, Jamaica."
>
> RO:   "Runaway. Runaway?"
>
> TP:   "Yeah, Runaway. It's like Ocho Rios, next to Ocho Rios."

RO:     "Ocho Rios, Run…okay…and then…"

TP:     "Both of them is nice, Ocho Rios and Montego Bay, they both nice."

RO:     "Alright, and then what…it was only like 8-800 bucks right? For per, per person?  Cause we, they, you know Jackie Jones is planning this big trip and you, I'm just trying to compare."

[Voices Overlap]

TP:     "Say that one more time bro.   Say that one more time bro."

RO:     "Jackie Jones is trying to take a big trip.   She's trying to get people to go but it's kinda high."

TP:     "No, ours was like 13-1400 a person."

RO:     "Okay, and it was for 5 days and it was..."

[Voices Overlap]

TP:     "7, no, no it was 7."

RO:     "And that included your flight and all-inclusive right?"

TP:     "Yep."

RO:     "Okay, let me tell my girl.   Okay and then I'll probably be seeing you, uh tomorrow or Tuesday."

TP:     "Okay."

66.    Based upon my training, knowledge, experience, and the context of this conversation, I believe that OATIS was actually asking PIERCE about a trip to Jamaica that PIERCE had previously taken.   However, at the end of the call, the conversation shifted from the trip to OATIS informing PIERCE that OATIS will "probably be seeing you, uh tomorrow or Tuesday."   I believe OATIS informed PIERCE that he intended to meet with PIERCE later in the week to acquire cocaine from PIERCE.   My belief is bolstered by the fact that there were no

intercepted communications between OATIS and PIERCE following this conversation until later in the week on December 27, 2019, as described further below.

67.     On December 23, 2019, OATIS placed an outgoing call from telephone number 724-724-931-1876 to telephone number 614-352-4164, utilized by MCKNIGHT.   Below is a transcription of the conversation between OATIS ("RO") and MCKNIGHT ("BM"):

BM:     "What's up nigga?"

RO:     "What's happening captain? I was gonna see if uh, if I plan on uh may, if you and your old lady, I'm planning a trip, maybe uh, we can do it now like maybe Aruba or Jamaica or something.   Like just plan it now, we just gotta put money up money towards it.   You know what I mean?   I was going to go to the travel agency this week.   See if y'all want, y'all two want to go."

[Voices Overlap]

BM:     "Mm-hmm."

RO:     "And then also next time you uh, you know, come through I'ma go ahead and do that like you said for me.   You know what I mean?   I'm gonna go ahead get…go ahead and get my ball rolling on my own."

BM:     [Chuckles] "Okay."

RO:     "Yeah 'cause I got people hitting me all of the sudden now so I'ma go ahead and…"

[Voices Overlap]

BM:     [Unintelligible] "Hell yeah.   'Cause your boy has, Tone been."

RO:     "Yeah it, it's coming like crazy, yeah so."

[Voices Overlap]

BM:     [Unintelligible] "Yeah. Tone been grabbing shit. Why what you need right now?"

[Voices Overlap]

RO: "Maybe, maybe we can…maybe we do a neen, a neen, and you give me a neen next time you come?"

BM: "Uh huh."

[Voices Overlap]

RO: "And I would have it done in like a matter of days 'cause man I got a few, I, this is like unexpected."

BM: [Laughs] "Yeah I got you."

RO: "That shit, that shit [Unintelligible] got that little, a little small little baby off you.   Little…You know?"

[Voices Overlap]

BM: "Right, right."

RO: [Unintelligible]

BM: "As long you don't have you girl mad, man.   At me man." [Laughs]

RO: "Nah."

BM: "You know."

RO: "You good. You good."

[Voices Overlap]

BM: "Huh?"

RO: "She know t- She knows times are getting hard." [Chuckles]

BM: "Okay.   I, I got to hear her green light." [Laughs]

RO: "No you don't. No you don't."

[Voices Overlap]

BM: "Don't…I don't want…Yeah man I don't want to have no [Unintelligible] in no household man.   Like, tell me motherfucker. It's best to be upfront and you know it.   I'ma do it anyways though.

37

RO:     [Unintelligible] "I know you is." [Laughs]

BM:     "Damn.   I'ma do it any motherfucking ways but shit."

RO:     "So when you think?   Like, a-, after Christmas? I mean, after New Years?"

BM:     "Uh, yeah, yeah."

[Voices Overlap]

RO:     [Unintelligible] "Alright."

BM:     "No, it'll be before that."

RO:     "I'm ready whenever."

BM:     "Uh-huh. Alright. My phone's" [Unintelligible]

[Voices Overlap]

RO:     What about this trip though?   You gonna talk to your old lady about it?

BM:     "Mm, I know she don't want to take no fucking trip."

RO:     "Why?"

BM:     "She, um, she cheap. She, like, um, hold on, I'ma see what it says."

RO:     "It's gone be cheap if we do it now."

[Voices Overlap]

BM:     "This my sister. I, I, I, I gotta get that. I'll call you back."

RO:     "Alright- Okay."

[Voices Overlap]

BM:     "Or [Unintelligible] and then call me back."

RO:     "Alright."

BM:     "Alright."

38

RO:    "Alright.   Yep."

68.    Based upon my training, knowledge, experience, and the context of the conversation between OATIS and MCKNIGHT, I believe that OATIS and MCKNIGHT initially spoke of a possible vacation to Jamaica.   However, the conversation quickly turned to drug distribution.   OATIS requested that, the next time MCKNIGHT was in OATIS' area ("next time you uh you know come through"), MCKNIGHT resupply OATIS with drugs ("do that like you did for me").   MCKNIGHT affirmed ("Hell yeah").   MCKNIGHT then advised that OATIS' associate ("Tone") has been purchasing drugs from MCKNIGHT ("Your boy Tone been grabbing shit").   MCKNIGHT asked OATIS what quantity of drugs OATIS desired to purchase from MCKNIGHT ("why what you need").   OATIS informed MCKNIGHT that OATIS desired to purchase nine ounces of cocaine ("maybe we do a neen, a neen, and you give me a neen next time you come.").   MCKNIGHT acknowledged OATIS' request ("Uh huh…") and agreed to sell OATIS nine ounces of cocaine ("Yeah I got you").   OATIS then informed MCKNIGHT that OATIS previously purchased cocaine from MCKNIGHT ("I got that little, a little small little baby off you.   Little…You know").   MCKNIGHT confirmed ("Right, right.").   I believe a "little baby" to be 4.5 ounces of cocaine, which is a lesser quantity than the 9 ounces that OATIS now desired to purchase from MCKNIGHT.   Therefore, I believe that OATIS' customer base has continued to grow, requiring him to acquire additional quantities of cocaine.   OATIS and MCKNIGHT agreed to conduct the cocaine transaction in early 2020 ("So when you think? Like, a-, after Christmas? I mean, after New Years?") or even before that ("No, it'll be before that.").   OATIS then advised MCKNIGHT that he would be ready to conduct the cocaine transaction whenever MCKNIGHT was available ("I'm ready whenever.").   I further believe that, as

discussed below, this transaction did not occur because OATIS immediately contacted PIERCE and JONES to supply him with cocaine.

69.     Because MCKNIGHT was unable to conduct the cocaine transaction with OATIS immediately, OATIS turned back to PIERCE and JONES to supply him with cocaine.   On December 26, 2019 at approximately 1:03 p.m., OATIS sent an outgoing text message from telephone number 724-931-1876 to JONES on telephone number 724-979-2909.   The text message read "12 noon tmrw."   JONES sent an outgoing text message from telephone number 724-979-2909 to telephone number 724-931-1876, utilized by OATIS.   The text message stated, "Ok."   Based upon my training, knowledge, experience, and my direct involvement in this investigation, I believe that OATIS texted JONES to schedule a meeting with JONES the following day for the purpose of purchasing cocaine from JONES.   JONES then affirmed.

70.     Based upon this, on December 27, 2019 at approximately 11:00 a.m., investigators conducted physical surveillance in the areas of **TARGET LOCATION 1**, OATIS' residence; **TARGET LOCATION 2**, JONES' residence; and **TARGET LOCATION 3**, PIERCE's residence.   At approximately 11:43 a.m., OATIS sent an outgoing text message from telephone number 724-931-1876 to PIERCE on telephone number 330-632-4667.   The text message read, "Pulling up."   Based upon my training, knowledge, and experience, I believe that OATIS informed PIERCE that OATIS was close to PIERCE's residence, **TARGET LOCATION 3**, so that PIERCE would be ready to meet with OATIS for the purpose of PIERCE supplying OATIS with cocaine.   PIERCE immediately responded by sending an outgoing text from telephone number 330-632-4667 to telephone number 724-931-1876, utilized by OATIS.   This text message read, "Ok."   I believe that PIERCE informed OATIS that PIERCE was ready to supply OATIS

with cocaine.   Simultaneously, investigators conducting physical surveillance of **TARGET LOCATION 3** observed OATIS arrive at the rear of **TARGET LOCATION 3**, driving a tan Cadillac Escalade (the "Escalade") bearing Pennsylvania registration, JYK-9827. [6]   Investigators observed OATIS park the Escalade in the middle of an ally behind **TARGET LOCATION 3**. OATIS exited the driver's side door of the Escalade at approximately 11:46 a.m.   OATIS walked towards the rear of **TARGET LOCATION 3** and entered the rear basement door. Approximately two (2) minutes later at 11:48 a.m., investigators observed OATIS exit **TARGET LOCATION 3**, walk back to the Escalade, and enter the driver's side.   Based upon my training, knowledge, experience; intercepted conversation between OATIS and PIERCE on December 22, 2019; the intercepted conversation between OATIS and MCKNIGHT on December 23, 2019; the controlled purchase of cocaine that CS4 conducted with PIERCE and JONES; and the short period of time that OATIS spent inside of **TARGET LOCATION 3**, which is a private location, I believe that PIERCE supplied OATIS with a quantity of cocaine.   I further believe that the pertinent portion of the December 22, 2019 conversation between OATIS and PIERCE was for the purpose of OATIS informing PIERCE that OATIS would be contacting PIERCE later in the week to arrange this transaction.   My belief is bolstered by the fact that, consistent with the controlled purchase of cocaine CS4 conducted from PIERCE and JONES, OATIS immediately contacted JONES to inform JONES that OATIS was on his way to meet with JONES to pay JONES for the cocaine that PIERCE had just supplied to him inside of **TARGET LOCATION 3**.

---

[6]     A Pennsylvania registration query revealed that "JYK-9827" is registered to "Romondo D. Oatis" at "501 Pennsylvania Avenue, Farrell, PA 16121."

71.     While OATIS was still parked in the alley behind **TARGET LOCATION 3**, OATIS sent an outgoing text message from telephone number 724-931-1876 to JONES on telephone number 724-979-2909.   The text message read "Omw."   JONES immediately replied by sending an outgoing text message from telephone number 724-979-2909 to telephone number 724-931-1876, utilized by OATIS.   The text message read, "15 min."   OATIS responded by sending an outgoing text message from telephone number 724-931-1876 to telephone number 724-979-2909, utilized by JONES.   The text message read, "K."   Based upon my training, knowledge, and experience; the controlled purchase of cocaine that CS4 conducted with PIERCE and JONES; the context of these text messages; and the physical surveillance of OATIS, I believe that OATIS contacted JONES to inform JONES that OATIS was on OATIS' way ("Omw") to meet with JONES to pay JONES for the cocaine that PIERCE had just supplied to OATIS.   JONES then instructed OATIS that JONES could not meet with OATIS for another fifteen (15) minutes. OATIS affirmed.

72.     OATIS then drove the Escalade from **TARGET LOCATION 3**.   At approximately 12:05 p.m., investigators observed OATIS arrive at **TARGET LOCATION 1**. OATIS exited the Escalade, leaving the Escalade parked in the street with the driver's side door open.   OATIS then walked into **TARGET LOCATION 1**.   Approximately three (3) minutes later at approximately 12:08 p.m., investigators observed OATIS exit **TARGET LOCATION 1**, reenter the Escalade with a juvenile male, and drive away.   Investigators could not continue physical surveillance of OATIS in the Escalade; however, investigators maintained physical surveillance of **TARGET LOCATION 2**.

73.     At approximately 12:14 p.m., OATIS sent an outgoing text message from telephone number 724-931-1876 to JONES on telephone number 724-979-2909.   The message read "Pulling up."   Based upon my training, knowledge, experience, and the context of this text message, I believe that OATIS informed JONES that OATIS was in the area of **TARGET LOCATION 2**.   Subsequently, investigators observed OATIS arrive at **TARGET LOCATION 2** in the Escalade.   OATIS exited the Escalade and entered **TARGET LOCATION 2**.   OATIS remained inside of **TARGET LOCATION 2** for approximately one (1) minute. OATIS then exited **TARGET LOCATION 2**, reentered the Escalade, and drove away.   OATIS drove the Escalade back to **TARGET LOCATION 1**, exited the Escalade, and entered **TARGET LOCATION 1**.   Thus, based upon my training, knowledge, and experience; the controlled purchase of cocaine that CS4 conducted with PIERCE and JONES; the context of these text messages; the physical surveillance of OATIS; and the brief period of time that OATIS remained in **TARGET LOCATION 2**, I believe that OATIS paid JONES for the cocaine that PIERCE supplied to OATIS inside of **TARGET LOCATION 3**.

74.     On a known date in January of 2020, a third confidential source of information (hereinafter, "CS5")[7] met with law enforcement at a prearranged staging location for the purpose

---

[7]     In 2019, CS5 agreed to cooperate for prosecutorial consideration.   CS5 is not an anonymous source.   CS5's interactions with law enforcement have been in person, and CS5 is aware that law enforcement knows the true identity of CS5.   Additionally, CS5 is periodically provided with admonishments and instructions that clearly outline CS5's involvement and guidelines.   To date, no information received from CS5 is believed to be dishonest or unreliable. Additionally, investigators have corroborated the information CS5 provided.   For these reasons, and as demonstrated herein, your Affiant believes information received from CS5 to be reliable and true and accurate to the best of my knowledge.   CS5 does have a felony drug conviction. However, at this time, further details of CS5's convictions will not be included since doing so will likely reveal to JONES his associates the identity of CS5 and thus place CS5's safety in jeopardy.

of conducting a controlled purchase of cocaine from JONES.   At approximately 4:54 p.m., in the

presence and at the direction of investigators, CS5 placed a recorded telephone call to JONES over

telephone number 724-979-2909 from CS5's known cellular telephone.   Below is a transcript of

the recorded conversation between JONES ("TJ") and CS5 ("CS5"):

TJ:     "Hello."

CS5:    "Hello what up baby?"

TJ:     "What up doe!"

CS5:    "Man what you sick or something?"

TJ:     "Nah you know getting over a cold."

CS5:    "Oh man you can't be sick on me now baby."

TJ:     "Ahhh I aint sick nigga I'm good, I'm just getting over it though."

CS5:    "I'm about to say you seemed healthy the other day."

TJ:     "I got a cough I've been drinking this Robitussin you know what I'm
        saying?"

CS5:    "You gotta, you gotta have wifey make you one of them concoctions with
        the liquor."

TJ:     [Laughing] "Hot chocolate."

CS5:    "Yeah yeah something, yeah man you you ready for me? I'm trying to
        come check you out?

TJ:     "Yeah c'mon.   I gotta be at work in an hour."

CS5:    "You gotta be at work in an hour?"

TJ:     "Yeah about an hour and a half you can come down.   It's up to you."

CS5:    "Yeah uh I'm right about to leave Walmart and shit.   I probably can be
        there in like probably like thirty minutes."

TJ:     "Alright I'm here."

CS5:    "Where you at the crib?"

TJ:     "Yep."

CS5:    "Alright what uh I don't…what's the address I don't remember it uh?"

TJ:     "One two three four."

CS5:    "Alright bet! I'll check you in a minute."

TJ:     "Alright."

CS5:    "Alright."

75.     Once the call terminated, CS5 confirmed that CS5 had just spoken with JONES. CS5 also confirmed that CS5 asked JONES whether JONES was available to sell CS5 cocaine ("man you you ready for me?").   JONES affirmed ("Yeah c'mon").   CS5 then asked JONES if JONES was at **TARGET LOCATION 2** ("Where you at the crib?").   JONES affirmed ("Yep"). JONES then provided his address to CS5 ("One two three four."), which is JONES known address of 1234 Roamer Blvd, Farrell, PA 16121, **TARGET LOCATION 2**.   CS5 advised JONES that CS5 intended to meet with JONES at **TARGET LOCATION 2** to conduct the controlled purchase of cocaine ("Alright bet! I'll check you in a minute.").   JONES affirmed ("Alright.").

76.     Investigators provided CS5 with a quantity of Official Agency Funds and equipped CS5 with an audio and video recording device.   Investigators followed CS5 to **TARGET LOCATION 2**.   Investigators observed CS5 enter **TARGET LOCATION 2**.   CS5 remained inside of **TARGET LOCATION 2** for approximately nine (9) minutes.   Investigators then observed CS5 exit **TARGET LOCATION 2**.   Investigators followed CS5 to a predetermined staging location where CS5 provided a quantity of cocaine to investigators.   CS5 advised that CS5

met with JONES.   CS5 agreed to purchase a specific quantity of cocaine from JONES in exchange for a specific quantity of Official Agency Funds.   CS5 then handed JONES the specific quantity of Official Agency Funds in exchange for a clear plastic bag containing the specific quantity of cocaine that CS5 agreed to purchase from JONES inside of **TARGET LOCATION 2**.

77.     Investigators reviewed the audio and visual recording from the recording device. The recording does not show a video of the controlled purchase of cocaine because investigators placed the audio and visual recording device in CS5's pocket.   However, the recording device did capture audio of the controlled purchase.   On the recording, CS5 and JONES discussed the price of the cocaine that JONES sold to CS5.

78.     On February 15, 2020 between approximately 9:32 p.m. and approximately 10:09 p.m., JONES exchanged a series of text messages over telephone number 724-979-2909 with an unknown individual ("UI4474") on telephone number 724-877-4474.   Below is a transcription of the text messages JONES ("TJ") and UI4474 ("UI4474") exchanged:

UM4474:     "It's Allan can u stop"

TJ:             "Yes in 30 min"

UM4474:     "Kool 1000 negley"

TJ:             "usual?"

79.     Based upon my training, knowledge, and experience as well as the context of these text messages, I believe that UI4474 contacted JONES to purchase an unknown quantity of cocaine from JONES ("can u stop").   JONES affirmed.   UI4474 provided JONES with an address to where UI4474 intended to meet with JONES to purchase the cocaine from JONES.   JONES asked

UI4474 if UI4474 desired to purchase the usual quantity of cocaine that JONES previously supplied to UI4474.

80.     On February 25, 2020 between approximately 7:01 p.m. and approximately 7:41 p.m., PIERCE exchanged a series of text messages over telephone number 330-623-4667 with OATIS on telephone number 724-931-1876.   Below is a transcription of the text messages between PIERCE ("TP") and OATIS ("RO"):

>    RO:     "Did we get yet"
>
>    TP:     "Yes"
>
>    RO:     "Want me to swing by now or do u want to bring"
>
>    TP:     "Cmon"

81.     Based upon my training, knowledge, and experience as well as the context of these text messages, I believe that OATIS contacted PIERCE to purchase an unknown quantity of cocaine ("did we get yet").   PIERCE affirmed.   OATIS asked PIERCE if OATIS should meet PIERCE at PIERCE's residence, **TARGET LOCATION 3**, to purchase the cocaine from PIERCE or if PIERCE intended to deliver the cocaine to OATIS' residence, **TARGET LOCATION 1.**   PIERCE instructed OATIS to travel to **TARGET LOCATION 3** to purchase the cocaine ("Cmon").

82.     On March 1, 2020, at approximately 3:41 p.m., JONES sent an outgoing text message from telephone number 724-979-2909 to OATIS on telephone number 724-931-1876. The message read "Good."   Based upon my training, knowledge, experience, and the context of this text message, I believe that JONES asked OATIS if OATIS was in the area and if OATIS had proceeds owed to JONES for a previous shipment of cocaine that JONES supplied to OATIS.

OATIS replied to JONES, "K. At chillies in boardman. I be when back."   Based upon my training, knowledge, and experience; the text message JONES sent to OATIS; and the context of this text message, I believe that OATIS acknowledged JONES' request and informed JONES that OATIS would bring JONES the proceeds when OATIS returned to the area.   Approximately one hour later, OATIS sent an outgoing text message from telephone number 724-931-1876 to JONES on telephone number 724-979-2909.   The text message read, "where you at 20 min."   JONES replied, "Home."   Subsequently, investigators conducted physical surveillance in the area of **TARGET LOCATION 2**.   Investigators observed OATIS arrive at **TARGET LOCATION 2** in a black GMC pickup truck.   OATIS exited the GMC pickup truck and entered **TARGET LOCATION 2**.   OATIS remained inside of **TARGET LOCATION 2** for approximately seven (7) minutes.   OATIS then exited **TARGET LOCATION 2**, reentered the GMC pick-up truck, and drove away.   OATIS drove the GMC pick-up truck directly to **TARGET LOCATION 1**, exited the GMC pick-up truck, and entered **TARGET LOCATION 1**.   Thus, based upon my training, knowledge, and experience; the text messages JONES and OATIS exchanged; the physical surveillance of OATIS; and the brief period of time that OATIS remained in **TARGET LOCATION 2**, which is consistent with a drug transaction, I believe that OATIS supplied JONES drug proceeds for cocaine that JONES previously supplied to OATIS.

83.   A search of **TARGET LOCATION 2** through CLEAR revealed that JONES currently resides at **TARGET LOCATION 2**.   Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 2** is JONES' listed address on his Pennsylvania Department of Motor Vehicle driver's license.   GPS/E911 location data for telephone number 724-979-2909, utilized by JONES, from October of 2019 through the middle of

February of 2020 established that the telephone was consistently present at **TARGET LOCATION 2,** with an accuracy of between 300 meters and 2,200 meters, to include daytime and nighttime hours.   As recently as September 16, 2020, investigators have observed JONES access **TARGET LOCATION 2** both arriving and departing the residence during both daytime and nighttime hours.   Toll records for telephone number 724-979-2909, utilized by JONES, revealed that JONES has been in contact with UI4474 as recently as September 22, 2020.

84.     A search of **TARGET LOCATION 3** through CLEAR revealed that PIERCE currently resides at **TARGET LOCATION 3**.   Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 3** is PIERCE's listed address on his Pennsylvania Department of Motor Vehicle driver's license.   As recently as September 16, 2020, investigators have observed PIERCE access **TARGET LOCATION 3** both arriving and departing the residence during both daytime and nighttime hours**.**   Toll records for telephone number 330-623-4667, utilized by PIERCE, revealed that PIERCE has been in contact with OATIS as recently as September 8, 2020.

85.     Thus, based upon my training, knowledge, and experience; the controlled purchase of cocaine CS4 conducted from JONES and PIERCE; the subsequent controlled purchase of cocaine CS5 conducted from JONES; JONES' and PIERCE's intercepted communications with OATIS; physical surveillance of OATIS, JONES and PIERCE; and the GPS/E911 location data for JONES' telephone, I believe that (1) JONES and PIERCE are drug traffickers; (2) JONES possesses and is domiciled at **TARGET LOCATION 2**, and PIERCE possesses and is domiciled at **TARGET LOCATION 3**; (3) JONES, PIERCE, and other members of the Organization continue to utilize **TARGET LOCATION 2** and **TARGET LOCATION 3** in furtherance of the

SUBJECT OFFENSES; and (4) **TARGET LOCATION 2** and **TARGET LOCATION 3** contain evidence of the SUBJECT OFFENSES.

### c.      TARGET LOCATION 4

86.      **TARGET LOCATION 4** is Tony MCKNIGHT's residence.   As discussed below, Tony MCKNIGHT accessed **TARGET LOCATION 4** during cocaine transactions.

87.      On January 20, 2020 at approximately 6:49 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 412-589-7642, utilized by Tony MCKNIGHT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and Tony MCKNIGHT ("TM"):

> TM:      "Hello"
>
> BM:      "Hey Tony, last time when you gave man that, you got some money from him right?"
>
> TM:      "Yeah, Red…it was eight three."
>
> BM:      "Oh, it was in threes?"
>
> TM:      "It was eight three.    Red said its eight three."
>
> BM:      "Let me call him cause nah."
>
> TM:      "Nah..."
>
> BM:      "Let me give him a call".
>
> TM:      "Alright."
>
> BM:      "Alright."

88.      Based upon my training, knowledge, and experience; my direct involvement in this investigation; and the context of this conversation, I believe MCKNIGHT contacted Tony MCKNIGHT to determine whether "Man" had paid Tony MCKNIGHT for the cocaine that

MCKNIGHT supplied to "Man."   Investigators know that "Man" is LATHAM, a/k/a "Man Mercer," through previous investigations into LATHAM.   Therefore, I believe that MCKNIGHT asked Tony MCKNIGHT if LATHAM had paid Tony MCKNIGHT for the cocaine that MCKNIGHT supplied to LATHAM.   Tony MCKNIGHT replied that "Red" provided Tony MCKNKGHT with $8,300 for the cocaine that MCKNIGHT supplied to LATHAM. Investigators know that "Red" is Tony MCKNIGHT's sister, Wanda MCKNIGHT.   Wanda MCKNIGHT is also LATHAM's live-in girlfriend.   Consequently, I believe that Wanda MCKNIGHT supplied Tony MCKNIGHT with $8,300 on behalf of LATHAM for the cocaine that MCKNIGHT supplied to LATHAM.

89.     On February 8, 2020 at approximately 7:03 p.m., MCKNIGHT placed an outgoing call over telephone number 614-352-4164 to telephone number 412-589-7642, utilized by Tony MCKNIGHT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and Tony MCKNIGHT ("TM"):

|     |     |
|-----|-----|
| TM: | "Hello." |
| BM: | "Hey Floyd." |
| TM: | "Yo?" |
| BM: | "What did B.J. give you yesterday?" |
| TM: | "Who?" |
| BM: | "B.J." |
| TM: | "I don't, he just gave me a stack.   He didn't say what it was." |
| BM: | "Oh okay, alright. Yep, yep." |
| TM: | "Where you at?" |

51

BM:     "He must have gave it all to you then.   Alright."

TM:     "Where you at?"

BM:     "I'm at home"

TM:     "Oh okay."

BM:     "It snowed man.   I was leavin this morning.   I got to Delaware it wasn't
        nothing but ice."

TM:     "I don't blame you.   Shit it's too bad out."

BM:     "Yeah, yep shit that is."

TM:     "Shit."

BM:     "Nope, wasn't going to do that."

TM:     "Huh?"

BM:     "I said I wasn't going to do that."

TM:     "Oh, I don't blame you."

BM:     "Hell no."

TM:     "Alright. I'll talk to you."

BM:     "Yeah alright"

90.     Based upon my training, knowledge, and experience and the context of this
conversation, I believe MCKNIGHT called Tony MCKNIGHT and asked Tony MCKNIGHT if
"B.J." paid Tony MCKNIGHT for the cocaine that MCKNIGHT supplied to "B.J."   Investigators
believe that "B.J." is JETTER (Brandon JETTER).   Tony MCKNIGHT responded that JETTER
paid Tony MCKNIGHT a "stack," which I believe to be drug proceeds in the form of United States
currency.   MCKNIGHT responded that MCKNIGHT believed JETTER supplied Tony
MCKNIGHT the full quantity of United States currency that JETTER owed to MCKNIGHT for

52

the cocaine that MCKNIGHT supplied to JETTER.  I further believe that MCKNIGHT was travelling to the New Castle, Pennsylvania area to collect the drug proceeds that JETTER supplied to Tony MCKNIGHT for MCKNIGHT at **TARGET LOCATION 4**; however, MCKNIGHT turned around due to inclement weather conditions.  Tony MCKNIGHT agreed to meet with MCKNIGHT to supply MCKNIGHT the drug proceeds that JETTER supplied to Tony MCKNIGHT for the cocaine MCKNIGHT supplied to JETTER in the future.

91.     On February 23, 2020 at approximately 4:01 p.m., MCKNIGHT placed an outgoing call over telephone number 614-352-4164 to telephone number 412-589-7642, utilized by Tony MCKNIGHT.  Below is a transcription of the conversation between MCKNIGHT ("BM") and Tony MCKNIGHT ("TM"):

TM:     "Hello?"

BM:     "Hey. [Inaudible] I'm here."

TM:     "Alright. You in the house?"

BM:     "Yeah I'm in the house."

TM:     "Alright. You know where my bedroom is at?"

BM:     "Your backroom?   Upstairs or downstairs?"

TM:     "No. No, you know where my bedroom is at?"

BM:     "Oh your bedroom? I don't know where it's at."

TM:     "Its. Listen. When you walk upstairs it's the one, slightly to the right and straight ahead."

BM:     "What Tony?"

TM:     "Listen. Listen"

BM:     "I'm going up….Hold on. I'm going upstairs.   Tony, tell me.   I'm a.

What you say, Tony?"

TM:     "The room that's to the right, up straight ahead."

BM:     "Hold on. Hold on. Hold on."

TM:     "I got a big 50 inch TV on the stand."

BM:     "Yeah. Um, um, I'm at your room."

BM:     "Close the door."

BM:     "Close the door, ok."

TM:     "Alright look, can you see in the closet?"

BM:     "Hold on. I can see in two closets, one closet, two closets. Yeah"

TM:     "Yeah the first closet."

BM:     "Ok."

TM:     "Look on the bottom.   There is an orange shoe box, with a black shoe on it."

BM:     "An orange shoe box?"

TM:     "Yep. It's off to the side."

BM:     "Hold on."

TM:     "If you, if you open the door to the closest, closest to the…ummm…"

BM:     "I see the orange shoe box."

TM:     "Ok, open it. That's my important papers in there.   Look in there."

BM:     "I just opened it."

TM:     "There's two stacks in there, you see them?"

BM:     "Yeah."

TM:     "There they go."

BM:     "Ok. Alright. Shit. Count this one."

TM:     "Alright bro. Octavia come with you?"

BM:     "Did what happened?"

TM:     "Did Octavia come with you?"

BM:     "Yeah. Octavia is downstairs."

TM:     "Oh ok. I was wondering."

BM:     "Huh?"

TM:     "I was wondering, how you got two cars there."

BM:     "Yeah you know what i mean.   Yep.   Yes she is, boy.   Come on.   Ok ok I see what's going on. A lot of hundreds here."

TM:     "Yeah that's what Nate said.   He got it umm, he went to the bank and got it done."

BM:     "Oh ok. Ok. That will work.   Sounds good to me.   You bet. Yes sir. Alright."

[Inaudible]

TM:     "Um.   When you coming back?"

BM:     "Uhh, well I got to come back soon cause umm I'm getting those two houses.   I gotta tell his girl that he got.   They…ain't in his name.   But I'm gonna get them for 13-5."

TM:     "He locked up though, ain't he?"

BM:     "Yeah.   He is.   They ain't in his name."

TM:     "Oh ok.   Cause I was about to say, If he locked up, you can still get an attorney to go in the jail and get that done."

BM:     "Wait. What you say happen?"

TM:     "If he's locked up, right?"

55

BM:     "Yeah."

TM:     "You can get an attorney too"

BM:     "Yeah."

TM:     "To go into whatever jail he's in and get him to sign the papers."

BM:     "They're not in his name, Tony!"

TM:     "Oh Ok."

BM:     "Nah.   Their not.   Not uh.   I aint worry about that.   They aint in none of his name."

TM:     "Are they worth getting?"

BM:     "Yeah. For uhh.   For seven and and and uhh six. Thirteen."

TM:     "Where they at?"

BM:     "One of them is up by Sheep's Hill.   Real fucking nice.   It's just two bedrooms.   And it's real tight."

TM:     "Where's the other one at?"

BM:     "Ahh South Side. I forget what street it's off of.   I'd have to put about 5 thousand into that one.   But the other one.   Someone took the electric out. The electric wires.   And that's all that needs.   It's nice.   It's real nice. What you got? A two bedroom?"

TM:     "Who me? Nah that's a three bedroom."

BM:     "Oh ok ok ok."

TM:     "I'm fitting to move out of there anyways."

92.     Based upon my training, knowledge, and experience as well as the context of this conversation, I believe MCKNIGHT contacted Tony MCKNIGHT to determine where Tony MCKNIGHT stored drug proceeds inside of **TARGET LOCATION 4** that Tony MCKNIGHT

56

collected from members of the Organization for MCKNIGHT. Tony MCKNIGHT directed MCKNIGHT to a shoe box located in the closet of an upstairs bedroom inside of a shoe box located inside of a closet, advising MCKNIGHT that there are "two stacks" of drug proceeds in the form of United States currency inside of the shoe box.   MCKNIGHT affirmed that MCKNIGHT had located the shoe box, adding, "I see what's going on. A lot of hundreds here."   I believe that MCKNIGHT observed the drug proceeds and determined that the drug proceeds contained multiple $100 bills.   MCKNIGHT then advised Tony MCKNIGHT that MCKNIGHT had travelled to **TARGET LOCATION 4** with MCKNIGHT's wife, Octavia MCKNIGHT. Contemporaneously, investigators conducted surveillance in the area of **TARGET LOCATION 4**.   They observed MCKNIGHT and Octavia MCKNIGHT arrive at **TARGET LOCATION 4** in a white Chevrolet Malibu.   They parked in front of **TARGET LOCATION 4** and entered **TARGET LOCATION 4** through the front door.   Approximately nine (9) minutes later, investigators observed MCKNIGHT and Octavia MCKNIGHT exit **TARGET LOCATION 4**. Octavia MCKNIGHT was carrying a dark backpack, and MCKNIGHT carrying a small child. MCKNIGHT and Octavia MCKNIGHT reentered the Chevrolet Malibu and drove.   Thus, I believe that MCKNIGHT acquired drug proceeds from **TARGET LOCATION 4** that Tony MCKNIGHT acquired from members of the Organization.

93.     On March 15, 2020 at approximately 12:07 a.m., MCKNIGHT placed an outgoing call over telephone number 614-352-4164 to telephone number 412-589-7642, utilized by Tony MCKNIGHT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and Tony MCKNIGHT ("TM"):

TM:     "Hello."

BM:    "Hey uh can Nate bring t…"

TM:    "Huh?"

BM:    "Nate can he bring that by?"

TM:    [Unintelligible]

BM:    "He coming right now.   Nine, he got nine."

TM:    "Huh."

BM:    "He got nine.   He coming right now."

TM:    [Unintelligible]

BM:    [Unintelligible]

TM:    "You said he going to bring it by now."

BM:    "Yeah he on his way right now."

TM:    "Alright tell him to call me."

BM:    "Okay alright."

94.    Based upon my training, knowledge, and experience as well as the context of this conversation, I believe MCKNIGHT called Tony MCKNIGHT and informed Tony MCKNIGHT that Nathaniel MCKNIGHT was travelling to **TARGET LOCATION 4** with nine ounces of cocaine that MCKNIGHT intended for Tony MCKNIGHT to store inside of **TARGET LOCATION 4** on MCKNIGHT's behalf.   Tony MCKNIGHT affirmed.   Tony MCKNIGHT advised MCKNIGHT to have Nathaniel MCKNIGHT call Tony MCKNIGHT when Nathaniel MCKNIGHT arrived at **TARGET LOCATION 4**.   Contemporaneously, investigators conducted physical surveillance of MCKNIGHT and Nathaniel MCKNIGHT in the area of the Harbor Heights Housing Complex, located in New Castle, Pennsylvania.   Investigators observed

Nathaniel MCKNIGHT drive away in a white Ford Fiesta with a male passenger towards **TARGET LOCATION 4**.   Subsequently, at approximately 12:22 a.m., members of the New Castle Police Department's patrol division initiated a traffic stop on Nathaniel MCKNIGHT's vehicle.   The passenger was identified as Joseph GARTRELL.   During the traffic stop, officers located and seized approximately 10 ounces of cocaine, three cellular telephones, and $832.00 in United States currency.   A photograph of the seized evidence is below:



95.    Based upon my training, knowledge, and experience; the conversation between MCKNIGHT and Tony MCKNIGHT; and the seizure of the aforementioned evidence from Nathaniel MCKNIGHT, I believe that Nathaniel MCKNIGHT was transporting the cocaine to Tony MCKNIGHT on MCKNIGHT's behalf and that Tony MCKNIGHT intended to store the cocaine at **TARGET LOCATION 4.**

96.    On June 16, 2020 at approximately 7:12 p.m., MCKNIGHT received an incoming voice call over telephone number 614-352-4164 from telephone number 412-589-7642, utilized by Tony MCKNIGHT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and Tony MCKNIGHT ("TM"):

BM:     "Hello?"

TM:     "Hey what's up man?"

BM:     "Not much."

TM:     "Shit, you still aint heard yet?"

BM:     "Uh-huh."

TM:     "Oh wow."

BM:     "Yeah.   I talked to him the other day.   I grabbed some green from him."

TM:     "Huh?"

BM:     "I grabbed some green from him."

[Voices Overlap]

TM:     "Oh..."

[Voices overlap]

BM:     "But other than that, ain't nothing."

[Voices overlap]

TM:     "Right."

BM:     "Uh-huh, nope."

TM:     "Oh."

BM:     "Huh?"

TM:     "Wow, it's been bad for a while then."

BM:     "Yeah…yeah."

TM:     "Oh well."

BM:     "That's a fact... uh-huh."

[Voices Overlap]

TM:     "Fuck it."

BM:     "Well shit…Let me uh, I'ma call my one white boy, cause he had told me something was supposed to had come through I think yesterday."

TM:     "Okay, let me know then."

BM:     "Cause he didn't hit me back so…that ain't…alright."

TM:     "Alright."

BM:     "Yep."

97.     Based upon my training, knowledge, and experience and the context of this conversation, I believe Tony MCKNIGHT called MCKNIGHT and asked MCKNIGHT if MCKNIGHT was resupplied with cocaine.  MCKNIGHT informed Tony MCKNIGHT that MCKNIGHT had not been resupplied with cocaine; however, MCKNIGHT added that MCKNIGHT spoke with his source of cocaine supply and acquired a quantity of marijuana.   Tony MCKNIGHT affirmed.  MCKNIGHT informed Tony MCKNIGHT that MCKNIGHT would MCKNIGHT's associate to acquire cocaine.  Tony MCKNIGHT responded that MCKNIGHT should contact Tony MCKNIGHT when MCKNIGHT was resupplied with cocaine. MCKNIGHT affirmed.

98.     A search of **TARGET LOCATION 4** through CLEAR revealed that Tony MCKNIGHT currently resides at **TARGET LOCATION 4**.  Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 4** is Tony MCKNIGHT's listed address on his Pennsylvania Driver's License.  Additionally, physical surveillance outside of **TARGET LOCATION 4** has shown Tony MCKNIGHT repeatedly entering and exiting **TARGET LOCATION 4**.  As recently as September 21, 2020, investigators

61

have observed Tony MCKNIGHT standing in the driveway of **TARGET LOCATION 4**.   Toll records for telephone number 614-352-4164, utilized MCKNIGHT, revealed that Tony MCKNIGHT has been in contact with MCKNIGHT as recently as September 16, 2020.

99.     Thus, based upon my training, knowledge, and experience; MCKNIGHT's and Tony MCKNIGHT's intercepted communications; physical surveillance of MCKNIGHT at **TARGET LOCATION 4** on February 23, 2020; and the 10 ounces of cocaine that was seized during the traffic stop of Nathaniel MCKNIGHT on March 15, 2020, I believe that (1) Tony MCKNIGHT is a drug trafficker who utilizes **TARGET LOCATION 4** to store cocaine and drug proceeds for MCKNIGHT; (2) Tony MCKNIGHT possesses and is domiciled at **TARGET LOCATION 4**; (3) Tony MCKNIGHT and other members of the Organization continue to utilize **TARGET LOCATION 4** in furtherance of the SUBJECT OFFENSES; and (4) **TARGET LOCATION 4** contains evidence of the SUBJECT OFFENSES.

### d.     TARGET LOCATION 5 and TARGET LOCATON 6

100.    TALBERT owns **TARGET LOCATION 5** and resides at **TARGET LOCATION 6**.   As described above and further below, TALBERT accessed both **TARGET LOCATION 5** and **TARGET LOCATION 6** during cocaine transactions.

101.    On February 26, 2020 at approximately 2:10 p.m., MCKNIGHT received an incoming call over telephone number 614-352-4164 from telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

        BM:    "What's up Mike?"

        MT:    "Hey, know what's good?"

BM:     "Yep."

MT:     "Say ah, give me one of them."

BM:     "Huh?"

MT:     "I'll do one of them."

BM:     "You need one, you say?"

MT:     "Whole one, yeah."

BM:     "A whole?   Okay."

MT:     "Yeah."

BM:     "Alright.   Let me get on it."

MT:     "Alright.   Ah, the short'll be with that too, right?"

BM:     "Yeah, I got you."

MT:     "Word."

BM:     "I don't forget shit, Mike."

[Both Laugh]

MT:     "Word."

BM:     "Huh?"

MT:     "I said, word."

BM:     "Okay man."

MT:     "Alright."

BM:     "Alright."

MT:     "Bye"

102.    Based upon my training, knowledge, and experience as well as context of this conversation, I believe that TALBERT called MCKNIGHT and inquired as to whether MCKNIGHT was resupplied with cocaine.   MCKNIGHT cryptically advised TALBERT that MCKNIGHT could supply TALBERT with cocaine.   TALBERT requested to purchase one kilogram of cocaine ("a whole one") from MCKNIGHT.   TALBERT also requested that MCKNIGHT supply TALBERT an additional quantity of cocaine that MCKNIGHT owed to TALBERT from a previous cocaine transaction ("the short'll be with that too, right"). MCKNIGHT affirmed.

103.    On February 29, 2020 at approximately 7:57 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

MT:    "What up?"

BM:    "What up killer?   Ah, that's going to be early in the morning.   I just found the keys to the rental I have man."

MT:    "Ah shit ahhhh, how early you talking so I know?"

BM:    "I'm leaving here at like 6, so it take me three hours bout 9, 9:30."

MT:    "Alright.   I'll be around.   I'll be up."

BM:    "Okay.   Yep.   My man."

MT:    "Okay."

BM:    "Alright."

MT:    "Alright."

104.     Based upon my training, knowledge, and experience; the previous conversation between MCKNIGHT and TALBERT on February 26, 2020; and the context of this conversation, I believe that MCKNIGHT called TALBERT and confirmed that TALBERT still intended to purchase one kilogram of cocaine from MCKNIGHT before MCKNIGHT travelled from Columbus, Ohio to Farrell, Pennsylvania to supply TALBERT with the one kilogram of cocaine. TALBERT affirmed.   MCKNIGHT then informed TALBERT that MCKNIGHT intended to meet with TALBERT the next morning, March 1, 2020, and that MCKNIGHT would be driving a rental vehicle to meet with TALBERT.

105.     On March 1, 2020, investigators conducted physical surveillance at **TARGET LOCATON 6**.   At approximately 8:07 a.m., investigators observed a grey Toyota Tundra Pickup truck, bearing registration CAR-4060,[8] parked in front of **TARGET LOCATON 6** and directly behind TALBERT's Chevrolet Silverado.   At approximately 8:46 a.m., investigators observed MCKNIGHT exit the front door of **TARGET LOCATON 6**.   Contemporaneously, TALBERT stood in the front doorway of **TARGET LOCATON 6**.   Based upon my training, knowledge, and experience; the intercepted communications between MCKNIGHT and TALBERT; and the physical surveillance of MCKNIGHT's meeting with TALBERT at **TARGET LOCATON 6**, I believe that MCKNIGHT ultimately sold TALBERT one kilogram of cocaine and supplied TALBERT with the additional quantity of cocaine that MCKNIGHT owed to TALBERT inside of **TARGET LOCATON 6**.

---

[8]     The Toyota truck is registered to Enterprise Rental Company and was rented to "Bruce MCKNIGHT" at "3176 Whitehead Road, Columbus, Ohio, 43204," which is MCKNIGHT's known residence.

106.    On March 5, 2020 at approximately 2:09 p.m., MCKNIGHT placed an outgoing
call from telephone number 614-352-4164 to TALBERT on telephone number 724-734-9541.
Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT
("MT"):

MT:    "Yep."

BM:    "What up man?"

MT:    "Same shit.   What's good?"

BM:    "Nothin', I'm over this way.   I'm ah ah, shoot your way before I leave."

MT:    [Unintelligible]

BM:    "Ah, look, I got a couple extra ones left.   You trying to get them?"

MT:    "You said, hold on let me turn this TV down real quick.   Hold on. What
you say?"

BM:    "I said I got a couple extra ones left over here.   You trying to get them?"

MT:    "How many?"

BM:    "Ah... shit I give you, hold on.   Hold on, I think it will be like six is what
I have left.   After I give you yours."

MT:    "Alright um shit..."

BM:    "Gimmie a buck fifty.   Yeah.   You hear me?"

MT:    "I mean, I, I will but shit.   I don't think, I don't think I can get into my
spot until later."

BM:    "What you talking about later?"

MT:    "Probably about nine o'clock."

BM:    "That's cool. I mean, I mean, I'm leaving though."

MT:    "Right. Yes."

BM:    "Not, not that one over there.   Don't give it to him.   He don't even know I'm here right now."

MT:    "Right, right, right."

BM      "Ah, so shit.   I'll see ya."

MT:    "Alright."

BM:    "I'll let you know when I'm coming back this way.   But I'm gonna bring that to you though."

MT:    "Okay."

BM:    "Alright.   Bye."

107.    Based upon my training, knowledge, and experience and the context of this voice call, I believe that TALBERT contacted MCKNIGHT and asked MCKNIGHT if MCKNIGHT still intended to supply TALBERT with 1.5 kilograms of cocaine that TALBERT had already paid MCKNIGHT to acquire.   MCKNIGHT affirmed and asked TALBERT if TALBERT wanted to purchase an additional six ounces of cocaine ("like six" "extra") for $1,050.00 per ounce ("Gimmie a buck fifty").   TALBERT advised MCKNIGHT that TALBERT would purchase the additional cocaine, however, TALBERT advised MCKNIGHT that it would have to be on consignment because TALBERT was unable to obtain money from an unknown location to pay MCKNIGHT prior to MCKNIGHT returning to Columbus, Ohio.

108.    On March 5, 2020 at approximately 4:15 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to TALBERT on telephone number 724-734-9541. Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

MT:    "What's up?"

BM:     "What's up man?   Where you want me to go?"

MT:     "I just knew you was gonna hit me when I was in the shower, man."

BM:     "Huh?"

MT:     "I said, I knew you was gonna hit me while I was in the shower."

BM:     "Man, it been an hour"

MT:     "Man you know I can't get in right away.   Shit always stopping me. Where you at?"

BM:     "Ah, right now I'm ah, up by the ah, let me see…the Rite-aid.   Fittin to come back down the hill"

MT:     "Okay.   Shit I just got out, I'll have to throw some clothes on.   Ah, shit if you want you can just throw it in the ah, I'll unlock my truck, you can just throw it in the back seat on the floor"

BM:     "I'll do that and lock the door"

MT:     "Okay, yeah, just ah..."

BM:     "Hey, the extra was just four and a half.   It's your one and a half and that four and a half."

MT:     "Oh, okay, okay, cool."

BM:     "Okay, yep.   Alright"

MT:     "So, well yeah, after you put in in there call me so I can lock it up. I, I put my alarm on."

BM:     "Oh okay, yep."

MT:     "Alright."

109.     Based upon my training, knowledge, and experience and the context of this voice call, I believe that MCKNIGHT advised TALBERT that the "extra" cocaine that MCKNIGHT intended to sell to TALBERT was actually 4.5 ounces, not 6 ounces.   TALBERT instructed

68

MCKNIGHT to place the cocaine under the seat of TALBERT's Chevrolet Silverado and to contact TALBERT afterwards.

110.    On March 5, 2020 at approximately 4:20 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to TALBERT on telephone number 724-734-9541. Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

> MT:    "Yo"
>
> BM:    "Yep. It's under there."
>
> MT:    "Alright.   What do I owe you for that?"
>
> BM:    "Ah, Just give me forty-five man."
>
> MT:    "Forty-five, word.   Got you."
>
> BM:    "Alright."
>
> MT     "Alright."

111.    Based upon my training, knowledge, and experience and the context of this voice call, I believe that MCKNIGHT advised TALBERT that MCKNIGHT had placed the cocaine inside of TALBERT's Chevrolet Silverado and that TALBERT owed MCKNIGHT $4,500.00 for the 4.5 ounces of "extra" cocaine.   Therefore, I believe that MCKNIGHT supplied TALBERT with approximately one 1 kilogram and 22.5 ounces of cocaine.

112.    During these calls, investigators conducted physical surveillance at **TARGET LOCATION 5** and monitored a pole camera affixed outside of **TARGET LOCATION 5**. Investigators observed MCKNIGHT drive a black Dodge Ram into the driveway of **TARGET LOCATION 5** and park next to TALBERT's Chevrolet Silverado.   An unknown black male

exited the front passenger's door of MCKNIGHT's Dodge Ram.   He then approached TALBERT's maroon Chevrolet Silverado, opened the driver's side door of TALBERT's maroon Chevrolet Silverado, and placed an object under the front seat.   He closed the door to TALBERT's maroon Chevrolet Silverado and reentered MCKNIGHT's Dodge Ram.   MCKNIGHT then drove his Dodge Ram from the area.   Approximately fifteen minutes later, investigators monitored the pole camera positioned outside of **TARGET LOCATION 5**.   They observed TALBERT exit **TARGET LOCATION 5**, open the doors of his maroon Chevrolet Silverado, and look underneath the seats.   After a short period of time, TALBERT closed the doors to his Chevrolet Silverado and walked back into **TARGET LOCATION 5**.   Therefore, through the interceptions of telephone number 614-352-4164, utilized by MCKNIGHT, and telephone number 724-734-9541, utilized by TALBERT, as well as the physical and electronic surveillance, I believe MCKNIGHT supplied TALBERT with the 1.5 kilograms and six ounces of cocaine.

113.   On March 29, 2020, between approximately 3:25 p.m. and approximately 7:06 p.m., TALBERT exchanged a series of text messages over telephone number 724-734-9541 with telephone number 724-931-1876, utilized by OATIS.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

| | |
|---|---|
| RO: | "Buck siz bout a hour" |
| MT: | "Word" |
| RO: | "Ready" |
| MT: | "Buck?" |
| RO: | "Yep. Siz" |
| MT: | "Give me 10 min" |

RO:     "How close"

MT:     "Here"

114.    Based upon my training, knowledge, and experience and the context of these text messages, I believe that OATIS advised TALBERT that OATIS desired to purchase $100.00 of cocaine from TALBERT ("Buck Siz").   TALBERT acknowledged OATIS' request and agreed to sell OATIS the cocaine.   TALBERT then advised OATIS that TALBERT had arrived at OATIS' residence.

115.    Investigators monitored the pole camera positioned outside of **TARGET LOCATION 5** and observed TALBERT depart from **TARGET LOCATION 5** in his Chevrolet Silverado.   Investigators also monitored the pole camera positioned outside of **TARGET LOCATION 1.**   TALBERT arrived at **TARGET LOCATION 1** in his Chevrolet Silverado approximately one minute later.   OATIS exited the front door of **TARGET LOCATION 1** and met with TALBERT at the passenger's side of TALBERT's Chevrolet Silverado.   OATIS reached his hand inside of the passenger's window of TALBERT's Silverado, which was consistent with a drug transaction.   Less than one minute later, OATIS walked away from TALBERT's vehicle and reentered **TARGET LOCATION 1**.   TALBERT then drove away.   Based upon my training, knowledge, and experience; the text messages OATIS and TALBERT exchanged; and the short duration of OATIS' meeting with TALBERT, I believe that TALBERT ultimately sold OATIS $100.00 of cocaine.

116.    On March 30, 2020, at approximately 6:32 p.m., TALBERT received an incoming text message over telephone number 724-734-9541 from telephone number 724-931-1876, utilized by OATIS.   The text message read, "Buck siz."   Based upon my training, knowledge, and

experience, I believe that OATIS texted TALBERT to inform TALBERT that OATIS desired to purchase $100 of powder cocaine from TALBERT; however, TALBERT did not respond to OATIS' text message.   Therefore, at approximately 7:13 p.m., TALBERT received an incoming call over telephone number 724-734-9541 from telephone number 724-931-1876, utilized by OATIS.   Below is a transcription of the conversation between TALBERT ("MT") and OATIS ("RO"):

> MT:   "What up?"
>
> RO:   "Yo, yo you get my text?"
>
> MT:   "You said you text me?"
>
> RO:   "Yep."
>
> MT:   "Man, I aint even see that shit bro."
>
> RO:   "Alright bro."
>
> MT:   "I didn't even see that shit, I'm about to look at it now."
>
> RO:   "Ok."
>
> MT:   "Alright."

117.    Based upon my training, knowledge and experience; the text message that OATIS sent to TALBERT; and the context of this conversation, I believe that OATIS called TALBERT and asked TALBERT whether TALBERT received OATIS' previous text message in which OATIS informed TALBERT that OATIS desired to purchase $100 of powder cocaine from TALBERT.   TALBERT responded that TALBERT had not seen OATIS' text message but that TALBERT would look at TALBERT's text messages immediately.   Between approximately 7:14 p.m. and approximately 7:37 p.m., TALBERT exchanged a series of text messages over telephone

72

number 724-734-9541 with telephone number 724-931-1876, utilized by OATIS.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

> MT:   "10 min"
>
> RO:   "At 30 hiz to"
>
> MT:   "Ok"
>
> RO:   "Here"

118.   Based upon my training, knowledge, and experience; the conversation between TALBERT and OATIS; and the text messages TALBERT and OATIS exchanged, I believe that OATIS contacted TALBERT to purchase $100.00 of powder cocaine ("Buck siz"), and $30.00 of cocaine base ("30 hiz").   TALBERT acknowledged OATIS' request and agreed to sell OATIS the cocaine and cocaine base.

119.   During these text messages, investigators monitored the pole camera surveillance outside of **TARGET LOCATION 5**.   TALBERT departed from **TARGET LOCATION 5** in his Chevrolet Silverado.   Physical surveillance then observed TALBERT arrive at **TARGET LOCATION 6** in his Chevrolet Silverado.   TALBERT entered **TARGET LOCATION 6** and remained inside of **TARGET LOCATION 6** for approximately four (4) minutes.   TALBERT then exited **TARGET LOCATION 6**, reentered his Chevrolet Silverado, and drove towards **TARGET LOCATION 1**.   Investigators monitored the pole camera surveillance outside of **TARGET LOCATION 1** and observed TALBERT arrive in his Chevrolet Silverado.   OATIS exited the front door of **TARGET LOCATION 1**, met with TALBERT at the driver's side of TALBERT's Chevrolet Silverado, and reached inside of the window.   Approximately 1 minute later, OATIS walked away from TALBERT's vehicle and reentered **TARGET LOCATION 1**.

TALBERT then drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and TALBERT; and the short duration of OATIS' meeting with TALBERT, I believe that TALBERT ultimately sold OATIS the cocaine and cocaine base.   I further believe that TALBERT utilized both **TARGET LOCATION 5** and **TARGET LOCATION 6** to facilitate this cocaine transaction.

120.    On April 1, 2020 between approximately 3:56 p.m. and approximately 4:12 p.m., TALBERT exchanged a series of text messages over telephone number 724-734-9541 with telephone number 724-931-1876, utilized by OATIS.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

> RO:    "buck siz"
>
> MT:    "Omw"
>
> RO:    "K"
>
> RO:    "Can u give me 10 min. In the shower"
>
> MT:    "Just hit me when u ready"

121.    Based upon my training, knowledge, and experience and the context of these text messages, I believe that OATIS texted TALBERT to advise TALBERT that OATIS desired to purchase $100.00 of powder cocaine ("Buck siz").   TALBERT affirmed and advised OATIS that TALBERT was on his way to meet with OATIS to sell him the cocaine.   However, OATIS requested that TALBERT arrive in ten minutes.   TALBERT affirmed.

122.    At approximately 4:17 p.m., TALBERT received an incoming voice call over telephone number 724-734-9541 with telephone number 724-931-1876, utilized by OATIS. Below is a transcription of the conversation between TALBERT ("MT") and OATIS ("RO"):

MT:    "Yo?"

RO:    "Yo, give me five minutes."

MT:    "Alright."

RO:    "Alright."

123.    Based upon my training, knowledge, and experience; the previous text messages that TALBERT and OATIS exchanged; and the context of this conversation, I believe that OATIS asked TALBERT to arrive at OATIS' residence in five minutes to sell OATIS the cocaine.

124.    Between approximately 4:25 p.m. and approximately 4:29 p.m., TALBERT exchanged a series of text messages over telephone number 724-734-9541 with telephone number 724-931-1876, utilized by OATIS.   Below is a transcription of the text messages TALBERT ("MT") and OATIS ("RO") exchanged:

RO:    "Ready"

MT:    "Here"

125.    Based upon my training, knowledge, experience; the previous communications between TALBERT and OATIS; and the context of these text messages, I believe that OATIS advised TALBERT that OATIS was available to meet with TALBERT and purchase the cocaine from TALBERT.   TALBERT responded that TALBERT was at OATIS' residence to sell OATIS the cocaine.

126.    Investigators monitored the pole camera surveillance outside of **TARGET LOCATION 5**.   TALBERT drove away from **TARGET LOCATION 5** in his Chevrolet Silverado.   Approximately sixteen (16) minutes later, investigators monitored the pole camera surveillance outside of **TARGET LOCATION 1** and observed TALBERT arrive in his Chevrolet

Silverado.   OATIS exited the front door of **TARGET LOCATION 1**, met with TALBERT at the driver's side of TALBERT's Chevrolet Silverado and reached in the window.   Approximately two (2) minutes later, OATIS walked away from TALBERT's Chevrolet Silverado and reentered **TARGET LOCATION 1**.   TALBERT then drove away.   Based upon my training, knowledge, and experience; the intercepted communications between OATIS and TALBERT; and the short duration of OATIS' meeting with TALBERT, I believe that TALBERT ultimately sold OATIS the cocaine.   I further believe that TALBERT utilized **TARGET LOCATION 5** to facilitate this cocaine transaction.

127.    A search of **TARGET LOCATION 5** through CLEAR revealed that this residence is owned by TALBERT and that the property taxes for **TARGET LOCATION 5** are being mailed to **TARGET LOCATION 6**.   A search of **TARGET LOCATION 6** through CLEAR revealed that TALBERT owns **TARGET LOCATION 6**.   Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 6** is TALBERT's listed address on his suspended Pennsylvania Driver's License.   Additionally, investigators obtained court-authorization to place, install, and use a GPS mobile tracking device on TALBERT's Chevrolet Silverado.   See Mag. Nos. 20-485 and 20-1046.   The GPS location data for TALBERT's Chevrolet Silverado, from March of 2020 through the beginning of June of 2020, revealed that the vehicle was consistently present at **TARGET LOCATION 5** in the early morning and nighttime hours.   Further, physical and pole camera surveillance at both **TARGET LOCATION 5** and **TARGET LOCATION 6** have shown TALBERT repeatedly entering and exiting both **TARGET LOCATION 5** and **TARGET LOCATION 6**.   As recently as September 4, 2020, investigators have observed TALBERT access both **TARGET LOCATION 5** and

TARGET LOCATION 6 during both daytime and nighttime hours.   Toll records for telephone number 724-734-9541, utilized by TALBERT, revealed that TALBERT was in contact with MCKNIGHT as recently as August 6, 2020.

128.    Thus, based upon my training, knowledge, and experience;   TALBERT's intercepted communications with OATIS and MCKNIGHT; physical and electronic surveillance of TALBERT, OATIS and MCKNIGHT; and the GPS location data for TALBERT's Chevrolet Silverado, I believe that (1) TALBERT is a drug trafficker; (2) TALBERT possesses and is domiciled at both **TARGET LOCATION 5**; (3) TALBERT possesses and owns **TARGET LOCATION 6** and utilizes **TARGET LOCATION 6** to facilitate his trafficking of cocaine; (4) TALBERT and other members of the Organization continue to utilize **TARGET LOCATION 5** and **TARGET LOCATION 6** in furtherance of the SUBJECT OFFENSES; and (5) **TARGET LOCATION 5** and **TARGET LOCATION 6** contain evidence of the SUBJECT OFFENSES.

### c.    TARGET LOCATION 7

129.    **TARGET LOCATION 7** is a third residence that TALBERT utilizes. Investigators believe that TALBERT stores the proceeds of his drug trafficking at **TARGET LOCATION 7**, as discussed below.

130.    On March 14, 2020 at approximately 12:59 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-813-0923, utilized by AUSTIN.   Below is a transcription of the conversation between MCKNIGHT ("BM") and AUSTIN ("TA"):

TA:    "Hello."

BM:    "What's up bow-wow?"

TA:    "What's up woman?"

BM:    "Huh?"

TA:    "That's what I was sayin', one of them dudes check my tire for me real quick, what's going on?"

[Unintelligible]

BM:    Man, listen though, if you over in the pen now, I need you to do that favor. If you still over there."

TA:    "Huh?"

BM:    "I said, if you at home, I need you to do me a favor."

TA:    "What's that?"

BM:    "Go see somebody for me real quick."

TA:    "I got my dude looking at my tire real quick, for real."

BM:    "I can't, I can't hear you, what you say?"

TA:    "I said my dude looking at my tire real quick for me, what happening?"

BM:    "Huh?"

TA:    "I said my dude, this dude, looking at, checking my tire for me real quick."

BM:    "Oh. Okay. But yeah when you get done though, you know who I'm talking about right?"

TA:    "Oh, I see."

BM:    "Um, go by, couple dollars that was supposed to been yours, but I couldn't get a hold of you and you didn't get a hold of me neither so."

TA:    "Ohh."

BM:    "Uh huh.  [Laughter] That was shit. That's if you don't mind. If you do it up, it's all good."

TA:   "Alright, just ah, I'll hit you as soon as I'm done."

BM:   "No, when can you be…Call me and let me know when you ready, so I can text him to let him know that you coming to get that. It's only…"

[Voices Overlap]

TA:   "Alright."

BM:   "Alright.   Okay.   Thanks Tone."

TA:   "Alright."

131.   Based upon my training, knowledge, experience; the subsequent communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called AUSTIN and instructed AUSTIN to meet with TALBERT to collect drug proceeds from TALBERT for cocaine that MCKNIGHT previously supplied to TALBERT.

132.   On March 14, 2020, at approximately 3:10 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

MT:   "What up?"

BM:   "What's going on with you Mike?"

MT:   "Ain't shit same old shit."

BM:   "I was going to say, you don't want Tone to come by that way, do you?"

MT:   "Said who?"

BM:   "Tone."

MT:   "Yeah he cool."

BM:   "Ok, ok.   I'll hit him up a little later on here today let him know.   Cause

79

um, I gotta go take care of something real quick in the Castle, or I would just stop."

MT:   "Oh ok. Yeah, yeah, that's cool."

BM:   "I appreciate that to man."

MT:   "Oh yeah no doubt, no doubt, shit same here."

BM:   "Yep, yep."

MT:   Alright."

133.   Based upon my training, knowledge, and experience; the previous conversation between MCKNIGHT and AUSTIN; the subsequent communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called TALBERT and asked TALBERT if AUSTIN ("Tone") could meet with TALBERT to collect the drug proceeds that TALBERT owed to MCKNIGHT for cocaine that MCKNIGHT previously supplied to TALBERT.   TALBERT affirmed.   MCKNIGHT further advised TALBERT that MCKNIGHT desired to sell additional quantities of cocaine in New Castle, Pennsylvania prior to MCKNIGHT returning to Columbus, Ohio or MCKNIGHT would retrieve the drug proceeds from TALBERT himself.

134.   On March 14, 2020, at approximately 9:08 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

MT:   "What up?"

BM:   "Yea, hey killer?"

MT:   "Yo?"

BM:   "Yeah, can you hear me?"

MT:   "Yeah."

BM:   "Hey, you know anybody looking for a couple?"

MT:   "Shit not right now, cause ah, I'm trying to do that thing we talked about last time."

BM:   "Yeah."

MT:   "But ah, it's probably going to be the middle of next week."

BM:   "Ok, that's, that's perfect. That's perfect timing."

MT:   "Cool, cool."

BM:   "That's perfect timing. I'll do that for you."

MT:   "Ok word, word."

BM:   "Trying to get rid of nine pack before I take off [Laughing]"

MT:   "Yeh I don't even…Shit, you know if', if it ain't me or my boy, I don't even…You know what I mean?"

BM:   "I know.   I know that shits right.   Did that, that one boy come yet man?"

MT:   "No he ain't never call me."

BM:   "Wow he told me he was on his way.   I could, could of been came took care of that shit man. See that's why I be saying, when motherfuckers need you man, they be all in you.   They be all in you. When you ask a mother fucker to do you a favor, that's how they…I could of came myself for real man."

MT:   "Right."

BM:   "If I knew he was going to carry it like that.   But, I talked to him an hour ago, he's like yeah I'm my way over there now."

MT:   "Yeah, shit I was getting ready to call you, ask you what was up, cause I didn't even know…I was waiting on you to hit me, to ah, or somebody to hit me before I went and grabbed it."

BM:   "That's why I wanted to see what you wanted to do, so I wanted to tell you, you can go for his money, if he can't do it I'm going to shoot over there real quick. Alright, let me…"

MT:   "Ok bu....I'm going to go, I'm gonna go snatch it up real quick."

BM:   "Ok."

MT:   "Word."

BM:   "Trying to get rid of nine pack before I take off [Laughing]"

135.   Based upon my training, knowledge, and experience; the previous communications between MCKNIGHT and AUSTIN; the previous communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called TALBERT and asked TALBERT if TALBERT or TALBERT's associates wanted to purchase ounce quantities of cocaine ("you know anybody looking for a couple?").   TALBERT advised MCKNIGHT that TALBERT did not wish to purchase the ounce quantities of cocaine but that TALBERT was awaiting on the prearranged quantity of cocaine that MCKNIGHT previously agreed to supply to TALBERT.   MCKNIGHT informed TALBERT that MCKNIGHT desired to sell nine ounces of cocaine prior to MCKNIGHT leaving to return to Columbus, Ohio ("trying to get rid of nine pack before I take off").   MCKNIGHT then asked TALBERT if AUSTIN collected the drug proceeds that TALBERT owed to MCKNIGHT for a previous shipment of cocaine. TALBERT advised MCKNIGHT that AUSTIN had not contacted TALBERT.   TALBERT further advised that TALBERT did not want to retrieve the drug proceeds from where TALBERT stored it, believed to be **TARGET LOCATION 7**, until MCKNIGHT confirmed that AUSTIN would meet TALBERT ("I was waiting on you to hit me, to ah, or somebody to hit me before I went and grabbed it").

136.   On March 14, 2020 at approximately 9:10 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-813-0923, utilized by AUSTIN.   Below is a transcription of the conversation between MCKNIGHT ("BM") and AUSTIN ("TA"):

TA:   "Hello?"

BM:   "What's going on, man?"

TA:   "Huh?"

BM:   "What's going on?"

TA:   "He ain't hit me back."

BM:   "I talked to him.   He says he's waiting on you, man."

TA:   "I don't know where he at, where he at? Why he ain't hit me back."

BM:   "You ain't call him, Tone?"

TA:   "I tried.   Alright.   Ask him where he's at, and why he didn't hit me back. Hit me back. He got a new number."

BM:   "He got the same number, man."

[Voices Overlap]

BM:   "Hold on, hold on, hold on.   I'm gonna send them to you. Let me know if you can't do it. If you can't do it, I'm going to run over there real quick."

TA:   "You talking about over here?"

BM:   "Yeah, man."

TA:   "I'm looking at my phone"

BM:   "Huh?"

TA:   "I sent the screen shot to your phone.   Look…He doesn't get back."

BM:   "I'm just gonna run over there real quick, man. Alright. Go over there real quick, man."

TA:   "You got what?"

BM:   "I'm just going to drive over there real quick.   That man told me that you weren't call him, man."

TA:   "Look at your phone, man.'

[Unintelligible]

BM:   "Alright.   I'ma try. Hold on."

[Unintelligible]

BM:   "He want me to go pick up the money right now.   He said he been waiting on you."

TA:   "You see the screen."

BM:   "I aint got no screen shot yet."

TA:   "Huh?"

BM:   "I aint got no screen shot from him.   Only I got from you."

TA:   "I'm talking about from me. I just sent it to you."

BM:   "I don't read all that."

TA:   "It's a picture you'll get it in a second."

BM:   "I been waiting on him to call me back.   Alright, I'm asking you a question. If you can't do it let me know man is what I'm saying."

TA:   "I don't know where I'm going is what I'm saying.   Call him what he say?"

BM:   "Let me call him him."

TA:   "Alright."

137.    Based upon my training, knowledge, and experience; the previous communications between MCKNIGHT and AUSTIN; the previous communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called AUSTIN and asked AUSTIN why AUSTIN had not contacted TALBERT to arrange to meet with TALBERT to collect the drug proceeds from TALBERT for the cocaine that MCKNIGHT previously supplied to TALBERT.   AUSTIN responded that AUSTIN contacted TALBERT, but TALBERT did not answer or respond.   MCKNIGHT advised that MCKNIGHT would contact TALBERT to determine where AUSTIN should meet TALBERT to collect the drug proceeds.

138.    On March 14, 2020 at approximately 9:14 p.m., MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-734-9541, utilized by TALBERT.   Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

MT:     "What up?"

BM:     "Nothin. Hey, he said he text you right."

MT:     "Huh?"

BM:     "He said he text you. He don't know where to come to."

MT:     "Shit he ain't text me at all. I didn't get no message."

BM:     "I know man, he sent me a little old dumb shit, talking about what, some old shit.   Don't even understand what it was saying for real.   Talking about a screen shot that he sent to you at ah, eight-forty seven.   I don't even understand this shit.   Supposed to catch up with you, shit like that. But, ah, you got his number?"

MT:     "Yeah, unless he changed that motherfucker."

BM:     "Where you want me to tell him to come to?"

85

MT:   "Tell him to uh, tell him I'll be at my uh, come to my new spot.   Ttell him I'll be there in uh, I'll be there in 10 minutes."

BM:   "Alright, yep."

MT:   "Ok."

BM:   "Good look."

139.    Based upon my training, knowledge, and experience; the previous communications between MCKNIGHT and AUSTIN; the previous communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called TALBERT and informed TALBERT that MCKNIGHT spoke with AUSTIN and that AUSTIN did not know where to meet TALBERT to collect the drug proceeds.   TALBERT advised MCKNIGHT to instruct AUSTIN that TALBERT would meet AUSTIN at **TARGET LOCATION 5** ("my new spot") in ten minutes.   MCKNIGHT affirmed.

140.    Approximately one minute later, MCKNIGHT placed an outgoing call from telephone number 614-352-4164 to telephone number 724-813-0923, utilized by AUSTIN. Below is a transcription of the conversation between MCKNIGHT ("BM") and AUSTIN ("TA"):

BM:   "He said he gonna be at his new spot waiting on ya in ten minutes."

TA:   "Huh?"

BM:   "He said he's gonna be at his new spot waiting on you in ten minutes."

TA:   "Alright. I'm trying."

BM    "Huh?"

TA:   "I said I'm trying. I don't know why he aint respond.   I ain't call, I text him."

BM:   "He said he didn't get no text from you man. You on your way man?"

86

TA:      [Mumbling]

BM:     "If you can't make that, call me back and I'll go get that."

TA:      "Alright."

BM:     "Alright."

141.    Based upon my training, knowledge, and experience; the previous communications between MCKNIGHT and AUSTIN; the previous communications between MCKNIGHT and TALBERT; and the context of this conversation, I believe that MCKNIGHT called AUSTIN and advised AUSTIN to meet TALBERT at **TARGET LOCATION 5** in approximately 10 minutes. AUSTIN affirmed.

142.    Contemporaneously, investigators conducted physical surveillance in the area of **TARGET LOCATION 5** and observed TALBERT exit **TARGET LOCATION 5** and drive directly to **TARGET LOCATION 7** in his Chevrolet Silverado.   TALBERT exited his Chevrolet Silverado and entered **TARGET LOCATION 7**.   Investigators also observed a gold Cadillac XTS, bearing Pennsylvania Registration KHW-6690 (the "Cadillac XTS"), parked in the driveway of **TARGET LOCATION 7**.   A query through the Pennsylvania Department of Transportation revealed that the vehicle is registered to TALBERT and Jerome DAVIS at **TARGET LOCATION 6.**   A few minutes later, TALBERT exited **TARGET LOCATION 7**, reentered his Chevrolet Silverado, drove directly to **TARGET LOCATION 5**, and parked in front of **TARGET LOCATION 5**.   Based upon my training, knowledge, and experience; the intercepted communications between MCKNIGHT and TALBERT; the intercepted communications between MCKNIGHT and AUSTIN; and the physical surveillance of TALBERT accessing **TARGET LOCATION 7** after advising MCKNIGHT that TALBERT had to "go grab" the drug proceeds

that TALBERT owed to MCKNIGHT, I believe that TALBERT accessed **TARGET LOCATION 7** to collect the drug proceeds that TALBERT owed MCKNIGHT for the cocaine that MCKNIGHT previously supplied to TALBERT.  I further believe that TALBERT drove directly from **TARGET LOCATION 7** back to **TARGET LOCATION 5** to meet with AUSTIN to supply AUSTIN with the drug proceeds for MCKNIGHT.

143.    Simultaneously, investigators conducting physical surveillance at TARGET LOCATION 5 observed AUSTIN arrive at **TARGET LOCATION 5** driving a white Acura TL, bearing Pennsylvania registration LBT-9339 and registered to Trevor AUSTIN and Jawdy AUSTIN at 915 Wheatland Road, West Middlesex, Pennsylvania 16159 (the "Acura TL"). AUSTIN parked his Acura TL directly behind TALBERT's Chevrolet Silverado.   TALBERT and AUSTIN exited their vehicles and met outside of **TARGET LOCATION 5.**   Approximately six minutes later, AUSTIN reentered his Acura TL and drove away.   TALBERT then entered **TARGET LOCATION 5.**   Based upon my training, knowledge, and experience; the intercepted communications between MCKNIGHT and TALBERT; the intercepted communications between MCKNIGHT and AUSTIN; the physical surveillance of TALBERT accessing **TARGET LOCATION 7** after advising MCKNIGHT that TALBERT had to "go grab" the drug proceeds that TALBERT owed to MCKNIGHT; the physical surveillance of TALBERT meeting with AUSTIN at **TARGET LOCATION 5** after AUSTIN agreed to meet with TALBERT to collect the drug proceeds from TALBERT at **TARGET LOCATION 5**, and TALBERT agreed to supply the drug proceeds to AUSTIN at **TARGET LOCATION 5**, I believe that TALBERT supplied AUSTIN with the drug proceeds that TALBERT owed to MCKNIGHT for cocaine MCKNIGHT previously supplied to TALBERT.   I further believe that TALBERT retrieved those drug proceeds

from **TARGET LOCATION 7** and that TALBERT continues to utilize **TARGET LOCATION 7** to store his drug proceeds.

144.    A search of **TARGET LOCATION 7** through CLEAR revealed that Keturah CHAMBERS ("CHAMBERS") owns **TARGET LOCATION 7**.   I know that CHAMBERS is Misty CHAMBERS' sister.   I also know that Misty CHAMBERS is TALBERT's live-in girlfriend.  Based upon my training, knowledge, and experience, I know that it is common for drug traffickers, like TALBERT, to place residences they utilize for drug trafficking in third-party names to evade law enforcement detection.   Additionally, investigators obtained court-authorization to place, install, and use a GPS mobile tracking device on TALBERT's Chevrolet Silverado.  See Mag. Nos. 20-485 and 20-1046.  The GPS location data revealed that, from March of 2020 through the beginning of June of 2020, TALBERT's Chevrolet Silverado was frequently present at **TARGET LOCATION 7**.   Finally, as recently as September 2 2020, investigators have observed TALBERT's Cadillac XTS parked at **TARGET LOCATION 7**.

145.    Thus, based upon my training, knowledge, and experience; the aforementioned intercepted communications; the physical surveillance of AUSTIN and TALBERT; the GPS location data for TALBERT's Chevrolet Silverado; and the consistent location of TALBERT's Cadillac XTS outside of **TARGET LOCATION 7**, I believe that (1) TALBERT is a drug trafficker; (2) TALBERT possesses **TARGET LOCATION 7**; (3) TALBERT and other members of the Organization continue to utilize **TARGET LOCATION 7** in furtherance of the SUBJECT OFFENSES; and (4) **TARGET LOCATION 7** contains evidence of the SUBJECT OFFENSES.

    **d.**   **TARGET LOCATION 8**

146.   **TARGET LOCATION** 8 is Marc TALBERT's[9] residence.   Marc TALBERT is
TALBERT's brother.   As discussed below, MCKNIGHT supplied TALBERT with pounds of
high-quality marijuana that TALBERT, in turn, supplied to Marc TALBERT at **TARGET
LOCATION 8**.

147.   On April 20, 2020 at approximately 11:25 a.m., MCKNIGHT placed an outgoing
voice call from telephone number 614-352-4164 to TALBERT on telephone number 724-734-
9541.   Below is a transcription of the conversation between MCKNIGHT ("BM") and
TALBERT ("MT"):

> MT:   "Bruh."
>
> BM:   "Nah, it wasn't nothin important like that.   But um, it was bout wha- you
> know, your people, your brah.   But um, if you don't tell them about them
> things for the 18 man he going to be mad at you bro.   'Cause it's that shit
> shit for real."
>
> MT:   "You said, you said tell him the 18?"
>
> BM:   "Yeah, on them greens 'cause um, I'm sliding that way tomorrow."
>
> [Voices Overlap]
>
> BM:   "Right. -Wants to bring him five down."
>
> MT:   "Right, wants you to bring him five down.   Let me, let me, let me hit him
> see what he talking about, I hit ya right back."
>
> BM:   "Alright."
>
> MT:   "Ah."

148.   Based upon my training, knowledge, and experience; my direct involvement in this
investigation; and the context of this conversation, I believe that MCKNIGHT called TALBERT

---

[9]        An indictment was not sought against Marc TALBERT as a result of this investigation.

and instructed TALBERT to contact TALBERT's brother, Marc TALBERT ("your brah"), to determine whether Marc TALBERT desired to purchase five pounds of high-quality marijuana for $1,800.00 per pound ("you said tell him the 18?", "Yeah on them greens").   TALBERT affirmed and informed MCKNIGHT that TALBERT would contact Marc TALBERT and determine whether Marc TALBERT desired to purchase the marijuana.   TALBERT then advised MCKNIGHT that TALBERT would call MCKNIGHT back.

149.    On April 21, 2020 at approximately 1:28 p.m., TALBERT placed an outgoing voice call from telephone number 724-734-9541 to MCKNIGHT on telephone number 614-352-4164. Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

BM:    "What's up, Mike?"

MT:    "You said uh, he said, ah, as long as it's official, yeah."

BM:    "Oh it's definitely that.   I can send you some pics though if you want too."

MT:    "No, hell no."

[Both Laugh]

BM:    "I don't blame you. That'd be- I don't blame you, fool. You like me uh-huh.   Oh it was gonna be from somebody else's phone."

[Both Laugh]

BM:    "But yeah.   Okay."

[Voices Overlap]

MT:    "Alright, yeah just uh, yeah just let me know, like I said you want this (Unintelligible), we do it."

BM:    "I- yeah. I hit you tonight and let you know what time I'm up. You already

know it be early though."

MT:    "Right, right."

BM:    "Okay. Yup."

MT:    "Okay."

150.    Based upon my training, knowledge, and experience; the previous voice call between MCKNIGHT and TALBERT; and the context of this conversation, I believe that TALBERT called MCKNIGHT and informed MCKNIGHT that TALBERT spoke with TALBERT's brother, Marc TALBERT.    TALBERT then advised MCKNIGHT that Marc TALBERT desired to purchase the marijuana from MCKNIGHT so long as the marijuana was of high quality.    MCKNIGHT assured TALBERT that the marijuana was of high quality and even offered to send TALBERT a picture of the marijuana, which TALBERT declined.    MCKNIGHT informed TALBERT that MCKNIGHT would contact TALBERT and provide TALBERT with a time to conduct the marijuana transaction.

151.    On April 22, 2020 at approximately 7:24 p.m., TALBERT placed an outgoing voice call from telephone number 724-734-9541 to MCKNIGHT on telephone number 614-352-4164. Below is a transcription of the conversation between MCKNIGHT ("BM") and TALBERT ("MT"):

BM:    "What's up, killer?"

MT:    "Hey, man.    Is it a no go?"

BM:    "I, I didn't make it down there, man. I'm coming tomorrow, though.

MT:    "Tomorrow?"

BM:    "For sure.    Yeah, I'll be down that way tomorrow.    I'm leaving early in the morning.

92

MT:    "Okay."

BM:    "Alright. Yeah."

152.    Based upon my training, knowledge, and experience, the previous conversations between MCKNIGHT and TALBERT; and the context of this conversation, I believe that TALBERT called MCKNIGHT to determine whether MCKNIGHT still planned to travel to Pennsylvania to sell TALBERT the marijuana.    MCKNIGHT affirmed and informed TALBERT that MCKNIGHT will travel to Pennsylvania the following morning to supply TALBERT with the marijuana for Marc TALBERT.

153.    Later that evening between approximately 11:13 p.m. and approximately 11:14 p.m., MCKNIGHT exchanged a series of text messages over telephone number 614-352-4164 with TALBERT on telephone number 724-734-9541.    Below is a transcription of the text messages MCKNIGHT ("BM") and TALBERT ("MT") exchanged:

BM:    "Don't forget I'm coming in the am."

MT:    "Im on it."

BM:    "K."

154.    Based upon my training, knowledge, and experience; the previous voice calls between MCKNIGHT and TALBERT; and the context of these text messages, I believe that MCKNIGHT texted TALBERT and informed TALBERT that MCKNIGHT would be travelling to Pennsylvania the following morning to sell TALBERT marijuana for Marc TALBERT.

155.    On April 23, 2020 between approximately 7:52 a.m. and approximately 7:54 a.m., MCKNIGHT exchanged a series of text messages over telephone number 614-352-4164 with

TALBERT on telephone number 724-734-9541.   Below is a transcription of the text messages MCKNIGHT ("BM") and TALBERT ("MT") exchanged:

> BM:   "I should be pulling inat 820 am."
>
> MT:   "Ok im a be at my spot we was at last time."
>
> BM:   "Ok."

156.    Based upon my training, knowledge, and experience; the previous communications between MCKNIGHT and TALBERT; and the context of these text messages, I believe that MCKNIGHT texted TALBERT and informed TALBERT that MCKNIGHT would arrive at 8:20 a.m.    TALBERT responded that MCKNIGHT should meet TALBERT at **TARGET LOCATION 6**.

157.    Investigators monitored the pole camera positioned outside of outside of **TARGET LOCATION 6**.    At approximately 8:20 a.m. on April 23, 2020, investigators observed MCKNIGHT arrive at **TARGET LOCATION 6** driving a teal Mazda sedan.    MCKNIGHT parked the teal Mazda sedan in front of TALBERT's Chevrolet Silverado and exited the vehicle. MCKNIGHT was carrying a large green suitcase.    MCKNIGHT then walked into **TARGET LOCATION 6** through the front door with the large green suitcase.    Approximately 5 minutes later, TALBERT exited **TARGET LOCATION 6**, entered his Chevrolet Silverado, and drove away.    Investigators followed TALBERT.    TALBERT drove directly to **TARGET LOCATION 8**.    TALBERT parked his Chevrolet Silverado in the driveway of **TARGET LOCATION 8**.    TALBERT exited his Chevrolet Silverado and entered **TARGET LOCATION 8**.    At approximately 8:33 a.m., TALBERT exited **TARGET LOCATION 8**, reentered his Chevrolet Silverado, and drove directly back to **TARGET LOCATION 6**.    Investigators again

monitored the pole camera positioned outside of **TARGET LOCATION 6**.   Investigators observed TALBERT exit his Chevrolet Silverado and reenter **TARGET LOCATION 6**.   At approximately 8:50 a.m., MCKNIGHT exited **TARGET LOCATION 6**.   MCKNIGHT was not carrying the large green suitcase.   MCKNIGHT reentered the teal Mazda sedan and drove away. Shortly thereafter, TALBERT exited **TARGET LOCATION 6**.   TALBERT was carrying what appeared to be the same large green suitcase that MCKNIGHT carried into **TARGET LOCATION 6**.   TALBERT placed the large green suitcase inside the bed of his Chevrolet Silverado.   TALBERT then entered the driver's seat of his Chevrolet Silverado, and drove away. Investigators followed TALBERT.   TALBERT drove directly back to **TARGET LOCATION 8**.   TALBERT parked his Chevrolet Silverado in the driveway of **TARGET LOCATION 8**. However, investigators were unable to observe TALBERT enter **TARGET LOCATION 8** due to their limited vantage point.

158.    Nevertheless, based upon my training, knowledge, and experience; the previous voice calls between MCKNIGHT and TALBERT; the previous text messages exchanged; and the physical surveillance of MCKNIGHT and TALBERT, I believe that MCKNIGHT transported the 5 pounds marijuana from Columbus, Ohio to **TARGET LOCATION 6** in the large green suitcase and provided the 5 pounds of marijuana to MCKNIGHT inside of **TARGET LOCATION 6**. TALBERT then travelled to **TARGET LOCATION 8** and collected payment for the 5 pounds of marijuana from Marc TALBERT.   TALBERT travelled back to **TARGET LOCATION 6** and provided that payment from Marc TALBERT to MCKNIGHT.   Finally, TALBERT travelled back to **TARGET LOCATION 8** and supplied the marijuana to Marc TALBERT inside of **TARGET LOCATION 8**.

159.     A search of **TARGET LOCATION 8** through CLEAR revealed that Marc TALBERT currently resides at **TARGET LOCATION 8**.  Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 8** as Marc TALBERT's listed address on his Pennsylvania Driver's License.   As recently as September 20, 2020, investigators have observed Marc TALBERT frequent **TARGET LOCATION 8** both arriving and leaving the address during both daytime and nighttime hours**.**

160.     Thus, based upon my training, knowledge, and experience; TALBERT's and MCKNIGHT's intercepted communications; and physical surveillance of MCKNIGHT and TALBERT on April 23, 2020, I believe that (1) Marc TALBERT is a drug trafficker; (2) Marc TALBERT possesses and is domiciled at **TARGET LOCATION 8**; (3) Marc TALBERT and other members of the Organization continue to utilize **TARGET LOCATION 8** in furtherance of the SUBJECT OFFENSES; and (4) **TARGET LOCATION 8** contains evidence of the SUBJECT OFFENSES.

### e.     TARGET LOCATION 9

161.     **TARGET LOCATION 9** is LATHAM's residence.   As discussed below, MCKNIGHT supplied LATHAM with marijuana inside of **TARGET LOCATION 9**.

162.     On March 14, 2020 at approximately 6:07 p.m., MCKNIGHT placed an outgoing voice call over telephone number 614-352-4164 to LATHAM on telephone number 757-238-1973. Below is a transcription of the conversation between MCKNIGHT ("BM") and LATHAM ("DL"):

> DL:     "Yo. DIZZERT. Hello? Hello?"
>
> BM:     "Hey. What up, man?
>
> DL:     "What up?"

BM:   "I ain't have my speaker phone on, but I'm like…"

[Voices Overlap]

DL:   "Oh, okay."

BM:   "And shit. Um…[Stutters]"

DL:   "Oh, alright."

BM:   "But um, that ain't gonna be around 'till after 7:00, though."

DL:   "Okay."

BM:   "Uh-huh, but I'm out this way."

DL:   "Okay."

BM:   "Alright."

DL:   "Alright."

163.   Based upon my training, knowledge, and experience as well as the context of this conversation, I believe that MCKNIGHT called LATHAM and informed LATHAM that MCKNIGHT would supply LATHAM with cocaine in New Castle, Pennsylvania after 7:00 p.m. LATHAM affirmed.

164.   On March 14, 2020 at approximately 6:44 p.m., MCKNIGHT received an incoming voice call over telephone number 614-352-4164 from LATHAM on telephone number 757-238-1973.   Below is a transcription of the conversation between MCKNIGHT ("BM") and LATHAM ("DL"):

DL:   "What up, boy?"

BM:   "Nothin'. I been down here like, down here like…You down Chubb's?"

DL:   "Yeah."

BM:     "Okay.   I'ma shoot down there real quick."

DL:     "Alright."

BM:     "Alright."

165.    Based upon my training, knowledge, and experience; the previous conversation between MCKNIGHT and LATHAM; and the context of this conversation, I believe that LATHAM called MCKNIGHT and asked MCKNIGHT where LATHAM should meet MCKNIGHT to purchase the cocaine from MCKNIGHT.   LATHAM and MCKNIGHT then agreed to meet at 1104 Booker Drive, New Castle, Pennsylvania, Nathaniel MCKNIGHT Sr.'s residence ("you down Chubb's", "Yeah").   Contemporaneously, investigators conducted physical surveillance in the area of 1104 Booker Drive, New Castle, Pennsylvania.   Investigators observed MCKNIGHT arrive at the residence and enter the residence at approximately 5:42 p.m. At approximately 6:34 p.m., LATHAM arrived in a white Chevrolet HHR, bearing Ohio temporary registration.   LATHAM exiting the vehicle and entered the residence.   At approximately 6:55 p.m., Tony MCKNIGHT arrived at the residence a blue Buick Sedan.   Tony MCKNIGHT exited the vehicle and entered the residence.   Approximately five minutes later, LATHAM exited the residence, reentered the Chevrolet HHR, and drove away.   At approximately 7:17 p.m., Tony MCKNIGHT exited the residence, reentered the Buick sedan, and drove away.   Based upon my training, knowledge, and experience; the previous conversations between MCKNIGHT and LATHAM; the physical surveillance of MCKNIGHT, Tony MCKNIGHT and LATHAM; I believe that MCKNIGHT supplied LATHAM with cocaine inside of 1104 Booker Drive, New Castle, Pennsylvania.

166.    On April 23, 2020 at approximately 8:19 a.m., MCKNIGHT placed an outgoing voice call over telephone number 614-352-4164 to LATHAM on telephone number 757-238-1973. Below is a partial transcription of the pertinent portion of the conversation between MCKNIGHT ("BM") and LATHAM ("DL"):

DL:    "Hello?"

BM:    "Nigga, you must be smelling me man."

DL:    "Man, Dirty."

BM:    "Nah, it's-it's dry right now man."

DL:    "Yeah."

[Voices Overlap]

BM:    "Real d-yeah, but um, but my dude."

DL:    "I kinda figured that."

BM:    "Huh?"

DL:    "I kinda figured that."

BM:    "But he told me, my dude my guy came to the house last week and he said that uh, the-the people they-they moving things around again soon. Yeah he said this last week so just waiting for probably get back around, 'cause I know we had run all the way out. So probably just waitin till for it to get back there, 'cause I know it's about to be any minute. But, I don't know right now, I just got here."

DL:    "I kinda figured that Dirt."

BM:    "I just got it here. [Laughs] That's why I said you must be smelling me or something man."

DL:    "What you say you did where?"

[Voices Overlap]

BM:     "In Farrell, I just pulled up in Farrell, my one dude's crib."

DL:     "Oh for-Oh for real?"

BM:     "Yeah."

DL:     "Uh, when you said that I thought meant kinda like reading your mind."

BM:     "Uh-uh. Uh-uh. But um, you know I be having that loud though man? That-that green?"

DL:     "Yeah, I-I know you you told me."

BM:     "Yeah. Yup."

DL:     "You told me."

BM:     "A-a-and listen that 18 that's cheap as fuck and dis that good shit right here. What I got right now."

[Voices Overlap]

DL:     "Yeah, yeah. I-I'ma call one of my mans today 'cause I-I ran into a few of my old crack buddies buddies.   You hear me?"

BM:     "I was goin to…Yeah I was going to tell you, gotta get that, get back into that too. Can't let the money stop shit."

DL:     "No doubt Dirt, no doubt."

BM:     "You know they sell in the Castle like 22 and 24?"

DL:     "Yeah."

BM:     "You know."

DL:     "Yeah."

BM:     "Then my numbers 18. Then like I said."

DL:     "Okay."

BM:     "I got the good. Yeah, so as soon as."

DL:     "Yeah, yeah."

167.     Based upon my training, knowledge, and experience as well as the context of this conversation, I believe that LATHAM contacted MCKNIGHT to purchase cocaine from MCKNIGHT.   MCKNIGHT responded that MCKNIGHT had no cocaine for sale ("It's dry right now").   LATHAM affirmed.   MCKNIGHT advised LATHAM that MCKNIGHT was currently in Ferrell, Pennsylvania at MCKNIGHT's associates residence.     Contemporaneously, investigators conducting physical surveillance in Farrell, Pennsylvania observed MCKNIGHT arrive at **TARGET LOCATION 6** and meet with TALBERT; therefore, I believe MCKNIGHT was referring to TALBERT.   MCKNIGHT then informed LATHAM that MCKNIGHT had pounds of high-grade marijuana that MCKNIGHT could sell to LATHAM for $1,800.00 per pound ("I be having that loud though" and "then my numbers 18").   MCKNIGHT advised LATHAM that LATHAM could sell the marijuana for $2,200.00 to $2,400.00 per pound in the New Castle, Pennsylvania area.   LATHAM affirmed.   MCKNIGHT informed LATHAM that MCKNIGHT would meet with LATHAM after TALBERT.   LATHAM affirmed ("I got the good. Yeah, so as soon as." amd "Yeah, Yeah").   At approximately 9:24 a.m., investigators conducting physical surveillance in the area of **TARGET LOCATION 9**, observed MCKNIGHT arrive at **TARGET LOCATION 9** in a teal Mazda sedan.   MCKNIGHT exited the Mazda sedan.   MCKNIGHT had a bag in his hand.   MCKNIGHT then entered **TARGET LOCATION 9** with the bag. Approximately twelve minutes later, MCKNIGHT and LATHAM exited **TARGET LOCATION 9**, entered MCKNIGHT's Mazda sedan, and drove away.   Investigators did not observe MCKNIGHT or LATHAM carry anything out of **TARGET LOCATION 9.**   Approximately ten minutes later, Nathaniel MCKNIGHT arrived at **TARGET LOCATION 9** in a green Ford Taurus.

Nathaniel MCKNIGHT then entering **TARGET LOCATION 9**.   At approximately 9:49 a.m., MCKNIGHT and LATHAM arrived back at **TARGET LOCATION 9** in the teal Mazda sedan and exiting the vehicle.   LATHAM was observed retrieving an item from the back seat of a black Mercedes Benz parked in the driveway of **TARGET LOCATION 9**.   A few minutes later, MCKNIGHT and LATHAM entered **TARGET LOCATION 9**.   A short time later, MCKNIGHT and Nathaniel MCKNIGHT exited **TARGET LOCATION 9** and drove away. Based upon my training, knowledge, and experience; the previous conversations between MCKNIGHT and LATHAM; and the physical surveillance of MCKNIGHT, Nathaniel MCKNIGHT and LATHAM, I believe that MCKNIGHT supplied LATHAM with marijuana inside of **TARGET LOCATION 9**.

168.   On June 20, 2020 at approximately 6:07 p.m., MCKNIGHT placed an outgoing voice call over telephone number 614-352-4164 to Darnell LATHAM on telephone number 757-238-1973.   Below is a transcription of the conversation between MCKNIGHT ("BM") and LATHAM ("DL"):

DL:   "What up, Dirt?"

BM:   "Not much.   Where you at?   The crib?"

DL:   "Nah.   I'm, I'm up hill on the [Unintelligible]. I had just left the motherfucking ATM, and it was down right there at the GNC. So, I'm about to shoot to this other one."

BM:   "Nah.   Don't trip on that.   He can catch you next time."

[Voices Overlap]

DL:   "Yeah.   I, I just left. It was out of order."

BM:   "I'll do that next time.   I had wanted to grab those, uh…"

[Voices Overlap]

DL:     "Oh."

BM:     "Two nickels that was, that I told you about."

DL:     "Um, oh, okay."

BM:     "Yeah."

DL:     "Okay, yeah.   I'm right up here on this hill."

BM:     "You need a ride?"

DL:     "Yeah, yeah."

[Voices Overlap]

BM:     "Alright.   Here I come."

DL:     "I'm [Unintelligible]…Alright."

BM:     "I don't know where you at on Sheep Hill, but…"

DL:     "Just, um…Remember where my old house was at?"

BM:     "Nope. I told you before, man [Laughs]"

DL:     "Coming, coming straight, coming straight up Jefferson Street?"

BM:     "I'm coming up Jefferson?"

[Voices Overlap]

DL:     "Like [Stutters] up by where the field's at."

[Voices Overlap]

BM:     "Yeah, yeah, yeah, yeah."

DL:     "On Sharp Street.   I'm gonna be walking, walking out right now."

BM:     "Okay."

DL:   "Alright."

BM:   "But, I'm, I'm leaving Pee Wee's house."

DL:   "Oh, okay, okay. I'ma wait a few minutes, and be walking out."

[Voices Overlap]

BM:   "Yeah, yeah, yeah.   Alright.   Yep."

DL:   "Alright."

169.   Based upon my training, knowledge, and experience as well as the context of this conversation, I believe that MCKNIGHT contacted LATHAM to acquire drug proceeds ("two nickels") that LATHAM owed to MCKNIGHT for a previous shipment of cocaine.   LATHAM affirmed.   MCKNIGHT advised LATHAM that MCKNIGHT was leaving his sister's residence ("I'm at Pee Wee's") and agreed to meet LATHAM on the south side of the City of New Castle ("Sheep Hill") so that LATHAM could supply MCKNIGHT with the drug proceeds.

170.   A search of **TARGET LOCATION 9** through CLEAR revealed that LATHAM currently resides at **TARGET LOCATION 9** with Wanda MCKNIGHT.   Furthermore, a query through the Pennsylvania Department of Transportation revealed that **TARGET LOCATION 9** as LATHAM's listed address on his Pennsylvania Driver's License.   As recently as September 14, 2020, investigators have observed LATHAM at **TARGET LOCATION 9.**   Toll analysis for telephone number 614-352-4164, utilized by MCKNIGHT, revealed that LATHAM has been in contact with MCKNIGHT as recently as September 7, 2020.

171.   Thus, based upon my training, knowledge, and experience; LATHAM's intercepted communications with MCKNIGHT; and physical surveillance of LATHAM meeting with MCKNIGHT, I believe that (1) LATHAM is a drug trafficker; (2) LATHAM possesses and is

domiciled at **TARGET LOCATION 9**; (3) LATHAM and other members of the Organization continue to utilize **TARGET LOCATION 9** in furtherance of the SUBJECT OFFENSES; and (4) **TARGET LOCATION 9** contains evidence of the SUBJECT OFFENSES.

## II.    CONCLUSION

172.    Based upon all of the foregoing, there is probable cause to conclude that, in the Western District of Pennsylvania, members of the Organization committed violations of Title 21, United States Code, Sections 841(a)(1) (distributing and/or possessing with intent to distribute a controlled substance), 843(b) (using any communication facility in committing a drug trafficking crime), and 846 (attempting or conspiring to commit a drug trafficking crime).    Further there is probable cause to believe that evidence of these crimes will be found upon searching the **TARGET LOCATIONS**.

WHEREFORE, I respectfully request that the Court issue a warrant authorizing members of the Drug Enforcement Administration, or their authorized representatives, including but not limited to other law enforcement agents assisting in the above-described investigation, to search the **TARGET LOCATIONS**, as described in Attachments A1 through A9, for the purpose of seizing items of evidence, particularly described in Attachment BI and using the protocols described in Attachment BI, in addition to searching the content of any cellular telephones located with the **TARGET LOCATIONS** pursuant to the search protocols in Attachment BII.

The above information is true and correct to the best of my knowledge, information and belief.

_/s Scott F. Patterson, IV_
Scott F. Patterson, IV
Narcotics Agent
Pennsylvania Office of Attorney General

Sworn to before me by _telephone_, pursuant to Fed. R. Crim. P. 4.1(b)(2)(A), this 24th day of September, 2020.

_____
The Honorable Patricia L. Dodge
United States Magistrate Judge
Western District of Pennsylvania

106

## ATTACHMENT A1

**Property to Be Searched**

The first property to be searched is **501 Pennsylvania Avenue, Farrell, Pennsylvania 16121 ("TARGET LOCATION 1").**   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 1** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 1** is further described as a beige-sided residence.   The front door is on the left-hand side under a covered front porch.   **TARGET LOCATION 1** is pictured below:



## ATTACHMENT A2

### Property to be searched

The second property to be searched is **1234 Roemer Boulevard, Farrell, Pennsylvania 16121 ("TARGET LOCATION 2").**   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 2** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 2** is further described as a two-story, yellow-sided residence with a sidewalk leading to the front porch.   **TARGET LOCATION 2** is pictured below.



## ATTACHMENT A3

### Property to be searched

The third property to be searched is **1226 Washington Street, Farrell, Pennsylvania 16121 ("TARGET LOCATION 3").**   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 3** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 3** is further described as a two-story, tan-sided residence with brown shutters.   **TARGET LOCATION 3** is pictured below.



## ATTACHMENT A4

### Property to Be Searched

The fourth property to be searched is **1015 Huey Street, New Castle, Pennsylvania 16101**

**("TARGET LOCATION 4").**   This application also specifically seeks authorization to search

the content of any cellular telephones located within **TARGET LOCATION 4** pursuant to the

search protocols in Attachment BII.   **TARGET LOCATION 4** is further described as two-story,

tan brick residence with white siding.   A staircase with rod iron railings leads to the front door.

**TARGET LOCATION 4** is pictured below:



## ATTACHMENT A5

### Property to Be Searched

The fifth property to be searched is **1201 Roemer Boulevard, Farrell, Pennsylvania 16121 ("TARGET LOCATION 5").**   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 5** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 5** is further described as a residence with yellow siding over brick.   A staircase leads to the front door.   **TARGET LOCATION 5** is pictured below:



## ATTACHMENT A6

### Property to Be Searched

The sixth property to be searched is **1002 Walnut Street, Farrell, Pennsylvania 16121** (**"TARGET LOCATION 6"**).   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 6** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 6** is further described as brown-sided, two-story residence.   **TARGET LOCATION 6** has a rod-iron, security, front door with a stair case leading up to it.   **TARGET LOCATION 6** is pictured below:



## ATTACHMENT A7

### Property to Be Searched

The seventh property to be searched is **98 Capitol Court, Farrell, Pennsylvania 16121 ("TARGET LOCATION 7").** This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 7** pursuant to the search protocols in Attachment BII. **TARGET LOCATION 7** is further described as a single-story, yellow-brick residence with an attached single-car garage. **TARGET LOCATION 7** is pictured below:



## ATTACHMENT A8

### Property to Be Searched

The eighth property to be searched is **270 Shenango Boulevard, Farrell, Pennsylvania 16121 ("TARGET LOCATION 8").**  This application also specifically seeks authorization to search the content of any cellular telephones located within the **TARGET LOCATION 8** pursuant to the search protocols in Attachment BII.  **TARGET LOCATION 8** is further described as a tan, two-and-a-half story residence with a detached two-car garage.  **TARGET LOCATION 8** is pictured below.



## ATTACHMENT A9

**Property to Be Searched**

The ninth property to be searched is **936 Hazel Street, New Castle, Pennsylvania 16101** (**"TARGET LOCATION 9"**).   This application also specifically seeks authorization to search the content of any cellular telephones located within **TARGET LOCATION 9** pursuant to the search protocols in Attachment BII.   **TARGET LOCATION 9** is further described as a yellow, two-story residence with white trim. The front door is on the right-hand side under a covered front porch.   **TARGET LOCATION 9** is pictured below:



**ATTACHMENT B**

**Particular Items to be Seized**

## I.      TARGET LOCATIONS

The locations listed in Attachments A1 through A9 and on the search warrants, including the curtilage and any sheds/outbuildings and vehicles located there, for evidence of violations of Title 21, United States Code, Sections 841, 843(b), and 846, including any of the following items found there:

1.      controlled substances;

2.      paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3.      books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4.      personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, unlawful firearm possession, money laundering, and the criminal use of communication facilities;

5.      cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders,

116

wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and tax return information, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6.      documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7.      computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, unlawful firearm possession, and money laundering; including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8.      firearms and other dangerous weapons; and

9.      identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

## II.      CELLULAR TELEPHONES

Any and all cellular telephones[10] recovered from the locations listed in Attachments A1 through A9 and on the search warrants for any and all fruits, contraband, records, evidence and instrumentalities relating to violations of Title 21, United States Code, Sections 841, 843(b), and 846, including:

1.      All records on cellular telephones that relate to violations of Title 21, United States Code, Sections 841, 843(b), and 846, including:

a.      Evidence of communications referring to or relating to illegal narcotics or narcotics trafficking, including records of telephone calls, emails, instant messaging, or other records of communications, and including the identity of phone numbers, email accounts, or other electronic accounts used for such communications;

b.      Evidence of communications with suppliers, purchasers, prospective suppliers, or prospective purchasers of illegal narcotics, including records of telephone calls, emails, instant messaging, or other records of communications, and including the identity of phone numbers, email accounts, or other electronic accounts used for such communications;

c.      Evidence of communications referring to or relating to firearms and/or ammunition, including records of telephone calls, emails, instant messaging, or other records of communications, and including the identity of phone numbers, email accounts, or other electronic accounts used for such communications;

---

[10]      The cellular devices will be charged and powered on.   The device(s) and all readable and searchable contents will be downloaded to a "CelleBrite" or "XRY" or similar device.   The contents downloaded on the "CelleBrite" or "XRY" or similar device will then be copied to a readable computer disc and reviewed by your affiant.   A search warrant return will be provided to the Court thereafter.

     d.     Documents, including photographs and video, depicting illegal narcotics, drug paraphernalia, firearms, or ammunition;

     e.     Documents, including video and/or audio recordings, discussing and/or referring to illegal narcotics, drug paraphernalia, firearms, or ammunition;

     f.     Documents, including photographs and video, depicting illegal narcotics, drug paraphernalia, firearms, ammunition, violence relating to firearms or ammunition;

     g.     Any and all information revealing the identity of co-conspirators in drug trafficking and/or firearm-related activity;

     h.     Any and all bank records, transactional records, records of wire transfers, checks, credit card bills, account information, and other financial records;

     i.     Any and all information suggesting sudden or unexplained wealth and/or unidentified conspirators;

     j.     Any and all information identifying the sources of supply and/or unidentified conspirators may have secured illegal narcotics, drug paraphernalia, firearms, and/or ammunition; and

     k.     Any and all information recording the scheduling of travel and/or unidentified conspirators, including destinations, dates of travel, and names used during travel.

2.     All text messaging, call logs, emails, and/or other records of communication relating to the planning and operation of drug trafficking and misuse of communications facilities, in violation of 21 U.S.C. §§ 841, 843(b), and 846.

3.     Evidence of user attribution showing who used, owned, or controlled the cellular telephones at the time the things described in this warrant were created, edited, or deleted, such as

logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

4.      Evidence of software that would allow others to control t the cellular telephones, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

5.      Evidence of the lack of such malicious software.

6.      Evidence indicating how and when the cellular telephones were accessed or used to determine the chronological context of the cellular telephones access, use, and events relating to the crimes under investigation and to the cellular telephones user.

7.      Evidence indicating the cellular telephones user's state of mind as it relates to the crime under investigation.

8.      Evidence of the attachment to the cellular telephones of other storage devices or similar containers for electronic evidence.

9.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the cellular telephones.

10.      Evidence of the times the cellular telephones were used.

11.      Evidence of how the cellular telephones were used and the purpose of its use including firewall logs, caches, browsing history, cookies, "bookmarked" or "favorite" web pages, temporary Internet directory or "cache," search terms that the user entered into any Internet search engine, records of user-typed web addresses, and other records of or information about the cellular telephones' Internet activity.

12.     Records of or information about Internet Protocol addresses used by the cellular telephones.

13.     Passwords, encryption keys, and other access devices that may be necessary to access the cellular telephones.

14.     Documentation and manuals that may be necessary to access the cellular telephones or to conduct a forensic examination of the cellular telephones.

15.     Contextual information necessary to understand the evidence described in this attachment.

16.     All serial numbers or International Mobile Equipment Identity (IMEI) numbers associated with any cellular telephones.

17.     Log files, contact information, phone books, voicemails, text messages, draft messages, other stored communication, calendar entries, videos, and photographs related to matters described above.

In searching the cellular telephones, the federal agents may examine all of the information contained in the cellular telephones to view their precise contents and determine whether the cellular telephones and/or information fall within the items to be seized as set forth above.   In addition, they may search for and attempt to recover "deleted," "hidden," or encrypted information to determine whether the information falls within the list of items to be seized as set forth above.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any of the following:

a.     Any form of computer or electronic storage (such as hard disks or other media that can store data);

b.      Text messages or similar messages such as SMS or IM, saved messages, deleted messages, draft messages, call logs, all phone settings (*i.e.* call, messaging, display), priority senders, photographs, videos, links, account information, voicemails and all other voice recordings, contact and group lists, and favorites;

c.      Pictures, all files, cloud files and relevant data without password access, storage information, documents, videos, programs, calendar information, notes, memos, word documents, PowerPoint documents, Excel Spreadsheets, and date and time data;

d.      Payment information, to include account numbers, names, addresses, methods of payment, amounts, additional contact information, and financial institutions;

e.      Lists and telephone numbers (including the number of the phone itself), names, nicknames, indicia of ownership and/or use, and/or other contact and/or identifying data of customer, co-conspirators, and financial institutions;

f.      Applications (Apps), to include subscriber information, provider information, login information, contact and group lists, favorites, history, deleted items, saved items, downloads, logs, photographs, videos, links, messaging or other communications, or other identifying information;

g.      Social media sites to include, name and provider information of social media network(s), profile name(s), addresses, contact and group lists (*i.e.* friends, associates, etc.), photographs, videos, links, favorites, likes, biographical information (*i.e.* date of birth) displayed on individual page(s), telephone numbers, email addresses, notes, memos, word documents, downloads, status, translations, shared information, GPS, mapping, and other information providing location and geographical data, blogs, posts, updates, messages, or emails;

h.      Any information related to co-conspirators (including names, addresses, telephone numbers, or any other identifying information);

i.      Travel log records from GPS data (*i.e.* Google Maps and/or other Apps), recent history, favorites, saved locations and/or routes, settings, account information, calendar information, and dropped pinpoint information;

j.      Internet service provider information, accounts, notifications, catalogs, Wi-Fi information, search history, bookmarks, favorites, recent tabs, deleted items and/or files, downloads, purchase history, photographs, videos, links, calendar information, settings, home page information, shared history and/or information, printed history and/or information, or location data;

k.      Email data, including email addresses, IP addresses, DNS provider information, telecommunication service provider information, subscriber information, email provider information, logs, drafts, downloads, inbox mail, sent mail, outbox mail, trash mail, junk mail, contact lists, group lists, attachments and links, and any additional information indicative of operating a sophisticated fraud scheme, or other criminal violations;

l.      Any handmade form (such as writing);

m.      Any mechanical form (such as printing or typing); and

n.      Any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, cellular telephones, tablets, server computers,

and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.